Anthony LIUZZO, Jr., Thomas Liuzzo, Penny Liuzzo Dupure, Mary Liuzzo and Sally Liuzzo, Individually and as representatives of the Estate of Viola Liuzzo, deceased, Plaintiffs,

v.

UNITED STATES of America, and its agency, the Federal Bureau of Investigation, Defendants.

Civ. A. No. 79–72564.

United States District Court, E. D. Michigan, S. D.

Feb. 29, 1980.

Dean A. Robb, American Civil Liberties Union Fund of Michigan, Detroit, Mich., Jack D. Novik, American Civil Liberties Foundation, New York City, William Rastetter, Traverse City, Mich., for plaintiff.

L. Michael Wicks, Asst. U. S. Atty., Detroit, Mich., John J. Farley, Asst. Director, U. S. Dept. of Justice, Torts Branch, Civil Division, Washington, D. C., Mark J. Kurzmann, Trial Atty., U. S. Dept. of Justice, Torts Branch, Civil Division, Washington, D. C., for defendants.

MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

The case arises out of the tragic and brutal slaying of civil rights worker Viola Liuzzo in March of 1965. Plaintiffs, the children of Mrs. Liuzzo, have filed this action under the Federal Tort Claims Act [1] against the United States and its agency, the Federal Bureau of Investigation, alleging that the government was responsible for the murder of their mother, and that certain government agents mishandled and abused their mother's body after her death.[2]

This case is before the court on defendant's motion to dismiss on the grounds that plaintiffs' complaint, barred by the 2 year statute of limitations applicable to tort claims against the government, 28 U.S.C. § 2401(b), fails to state a claim upon which relief can be granted.[3] As more fully discussed below, the issue presented by this motion is whether plaintiffs' suit is barred by reason of the lapse of twelve years between the date of Mrs. Liuzzo's death and the date on which plaintiffs filed their ad-ministrative claim against the government. Specifically, the government's motion requires a determination of when, under § 2401(b), plaintiffs' cause of action accrued: in 1965, as the government argues, when Mrs. Liuzzo was killed, or in 1975, as plaintiffs argue, when information was disclosed which suggested a causative link between the conduct of FBI personnel and Mrs. Liuzzo's death.

In all cases in which a statute of limitations defense is interposed by a defendant, a thorough understanding of the facts is essential. Accordingly, an examination of the facts of this case follows. The sources of this factual history are the plaintiffs' complaint and affidavits and the numerous exhibits submitted by the parties for the court's perusal. These exhibits include newspaper and magazine articles, transcripts from earlier trials, transcripts of testimony given before the Senate Select Committee to Study Governmental Operations, and the Committee's Final Report issued in April of 1976.

*HISTORY OF THE CASE*

On March 25, 1965, Viola Liuzzo was in Alabama participating in civil rights activities, specifically, the Selma-Montgomery voting rights march. Following the march, Mrs. Liuzzo was driving between the cities of Selma and Montgomery with a black companion, Leroy Moten. During this trip, her car was overtaken by a car occupied by four members of the Ku Klux Klan. As the Klan car pulled alongside the Liuzzo car, the Klansmen opened their windows and fired on Mrs. Liuzzo and her companion.

---

1. 28 U.S.C. §§ 1346(b), 2401(b), 2671 *et seq.*

2. Plaintiffs allege six separate causes of action in their complaint:
   (a) That FBI informant Gary Rowe wrongfully murdered Viola Liuzzo;
   (b) That Rowe wrongfully failed to prevent the murder of Viola Liuzzo;
   (c) That the FBI wrongfully recruited, trained, and supervised Rowe;
   (d) That the FBI wrongfully authorized Rowe to participate in illegal activities;
   (e) That the FBI wrongfully failed to prevent Viola Liuzzo's murder;
   each of which directly or proximately caused Mrs. Liuzzo's death, and

   (f) That the FBI wrongfully abused and mishandled Viola Liuzzo's body after her death, and that as a proximate cause of such actions, plaintiffs suffered severe injuries, including emotional distress and mental anguish.

3. Defendant's motion to dismiss is brought pursuant to Federal Rule of Civil Procedure 12(b)(6). Because matters outside the pleadings have been submitted by both parties and considered by the court, this motion is disposed of under Rule 56, as one for summary judgment. F.R.C.P. 12(b) and (c).

The shots killed Mrs. Liuzzo, but her passenger escaped injury.

On March 26, 1965, President Lyndon Johnson appeared on television, flanked by FBI Director J. Edgar Hoover and Attorney General Nicholas Katzenbach, and announced the arrests of four Klansmen in connection with the Liuzzo murder. President Johnson stated:

Due to the very fast and the always efficient work of the special agents of the FBI who worked all night long immediately after the tragic death of Mrs. Viola Liuzzo on a lonely road between Selma and Montgomery, Alabama, arrests were made a few minutes ago of four Ku Klux Klan members . . . charging them with conspiring to violate the civil rights of the murdered woman.

After naming the arrested Klansmen, the President continued:

I cannot express myself too strongly in praising Mr. Hoover and the men of the FBI for their prompt and expeditious and very excellent performance in handling this investigation.

It is in keeping with the dedicated approach that this organization has shown throughout the turbulent era of civil rights controversies.

New York Times, March 27, 1965.

One of the arrested Klansmen, Gary Rowe, later surfaced as an undercover FBI informant. Rumors that one of the Klansmen was an informant began to circulate when a federal grand jury indicted only three of the Klansmen, and were confirmed when the informant testified, under heavy guard, before the Alabama grand jury. On Rowe's testimony, the state grand jury returned murder indictments against the three other men who were in the car.

Three criminal trials resulted from the Liuzzo murder: two murder trials in the state courts and one federal conspiracy trial. Only one of the three indicted Klansmen was tried on the murder charge, Collie LeRoy Wilkins. His first trial resulted in a hung jury, and the second in an acquittal. All three Klansmen were successfully prosecuted on the federal charge of conspiring to violate Mrs. Liuzzo's civil rights, and, on verdicts of guilty, each received the maximum sentence.

Gary Rowe testified at all three trials, and related both the background of his involvement with the Ku Klux Klan and the FBI, and his version of the events which took place on March 25. Rowe testified that he was approached by an FBI agent in 1960 or 1961 and was asked to infiltrate the Klan. His duties, he stated, were to "keep up with" any violent actions, and to report to the FBI on the men whom he met in his undercover work.

In March of 1965, Rowe lived in Birmingham, Alabama. His testimony concerning Mrs. Liuzzo's murder was as follows. Rowe said he left Birmingham for the Selma-Montgomery area on the morning of the 25th, and called his FBI contact agent to inform him of the trip. While in Selma, Rowe and three Klan companions spotted Mrs. Liuzzo and a black man in a car. His companions expressed a desire to "take them." The Klansmen pursued the Liuzzo car down Highway 80 between Selma and Montgomery, and tried several times to overtake the car. Rowe testified that he tried to convince the Klansmen several times to turn back, but that they insisted on continuing. Finally, on the fourth attempt, at speeds approaching 100 miles per hour, the Klan car overtook the Liuzzo car. Rowe stated that as they overtook the Liuzzo car, one of the Klansmen passed his gun to Wilkins, and Wilkins opened his window and fired two shots, just as Mrs. Liuzzo turned to her left and look at them. According to Rowe, Eugene Thomas, the owner of the gun, directed the men to "shoot the hell out of them." Rowe testified that he drew his pistol and pretended to fire, but didn't. Rowe further testified that he did not know when he left Birmingham that the trip would end in a slaying, and that he was powerless to prevent the murder because he didn't know that shots would be fired until they were fired. Rowe stated that he phoned the FBI contact agents upon his return to Birmingham and later turned over his pistol to the agents.

Rowe's testimony was not, of course, unchallenged in the three trials. At the first state trial, Wilkins was represented by Matt Murphy, Imperial Klonsel of the Klan. Murphy questioned Rowe on an alleged bribe he received from the FBI to testify, and Rowe stated that he was not bribed, and that Murphy himself had manufactured the story. Murphy also questioned Rowe regarding threats Rowe allegedly made to "kill niggers," and about a trip to Tuscaloosa when he allegedly had a burp gun in his car. Murphy asked whether Rowe himself had insisted on "killing some niggers" on the night of the murder. Rowe repeatedly denied Murphy's allegations. Murphy's cross-examination of Rowe did establish, however, that Rowe was a paid informant, and that Rowe was paid for his expenses and the information that he provided the FBI.

The cross-examinations in the second state trial and in the federal conspiracy trial included further attempts to impeach Rowe. In these trials, Arthur Hanes, a former FBI agent, served as defense counsel, and attempted to portray Rowe as a paid FBI troublemaker. The focus of Hanes' line of questioning was the 1961 Klan attack on the Freedom Riders at the Birmingham bus depot. Hanes' questions to Rowe elicited the information that Rowe was present at the scene, and was, at the time, working for the FBI. Hanes asked whether Rowe helped "jump on these riders," and Rowe denied the allegation. He did state, however, that he was involved in an affray:

Q: You worked for the FBI, and you were involved in that affray. Were you ordered by the FBI to engage in that affray and provoke a little trouble?

A: No, sir. I did that on my self reservation.

Q: You did that on your "self reservation"?

A: Self preservation.

State murder trial transcript at 509.

Q: You participated in the attack on the first Freedom Riders on Mothers Day in Birmingham, Alabama, at the bus station, didn't you?

A: No, sir.

* * * * * *

Q: Were you there?

A: Yes, sir.

* * * * * *

Q: But you didn't participate in the attacks on these people?

A: No, sir.

Federal conspiracy trial transcript at 287–88.

At both trials, Hanes showed Rowe a picture from the Saturday Evening Post, March 2, 1963, depicting the attack on the Freedom Riders, and asked whether one of the individuals shown beating the riders was Rowe. Rowe denied that it was his picture.

Mr. Hanes: I would like for the record to show that I pointed to a rather hefty man with his back to the camera, and I asked the witness if that was he, and he said no.

Federal trial transcript at 289.

The federal conspiracy trial ended, as noted above, with convictions of all three Klansmen. If the exhibits submitted by plaintiffs and the government are any indication, this last trial marked the end of media interest in the case. As mentioned earlier, the two Klansmen in the car other than Wilkins were never tried on state criminal charges. The Liuzzo case surfaced again ten years later, in 1975, when the Senate Select Committee to Study Governmental Operations commenced an investigation. Prior to setting forth information obtained through this investigation, however, it is useful to summarize the facts believed to be accurate in 1965, the date on which the government states the statute of limitations began running.

It was clearly established in 1965 that Rowe was a paid, undercover FBI informant who was in the car with the three Klansmen accused of killing Viola Liuzzo. On Rowe's testimony, it was believed that Collie LeRoy Wilkins fired the murder

weapon, and Rowe's testimony provided the basis for three criminal prosecutions. Rowe and the FBI were credited with breaking the case both by the media and by President Johnson. Although Rowe was cross-examined during the three criminal trials regarding his activities with the Klan, Rowe consistently denied any wrongdoing. He acknowledged that he had been involved in an affray for his self preservation.

In 1975, the Senate Select Committee on Governmental Operations commenced its investigation, and directed its focus, in part, to the activities of the FBI and Gary Rowe in the civil rights movement. Rowe was deposed[4] by the Committee in October of 1975, and testified before the Committee on December 2, 1975. The Committee issued its Final Report in April, 1976. The Senate investigation revealed more information regarding the activities of the FBI and Rowe in the civil rights movement of the early 1960s.

When he appeared before the Senate Committee, Rowe testified that his initial instructions from the FBI regarding his participation in violent activities were explicitly against such participation. Rowe stated, however, that his contact agent was dissatisfied because Rowe was not reporting on the violence that the Bureau knew was occurring. Rowe was then instructed to get closer to the action groups within the Klan. Regarding his participation in violence against civil rights workers, Rowe stated that he informed his agent in advance of the violence. When asked what his instructions were, Rowe replied that the agent told him:

We have to by law instruct you that you are not to participate in any violence. However, I know you have to do this. We know it's something that you have to do and we understand it, and we need the information. That's the important thing: get the information.

Senate Committee Hearings, Vol. 6, p. 117.

Rowe related that he had participated in the 1961 attack on the Freedom Riders, and that the FBI knew of the planned violence three weeks in advance. In contrast to his 1965 testimony, Rowe stated to the Committee that he had made a trip to Tuscaloosa, and that he had been arrested with various types of weapons in his car. Rowe further stated that although he had reported on "high dozens" of incidents of planned violence, to his knowledge, the FBI prevented only two of the incidents.

The Liuzzo murder was mentioned twice during Rowe's testimony, when he was asked whether he surfaced in connection with the murder, and when he was asked whether he helped solve the murder. Rowe's testimony before the Committee disclosed no facts about the Liuzzo case not known in 1965.

Rowe's deposition testimony, however, filled in other aspects of his duties as an undercover FBI informer. That part of deposition which involves the Liuzzo case provides information that adds to his 1965 story. Rowe stated that on the morning of March 25, he received a phone call from a Klansman, Robert Thomas, and was told to go to the march. Rowe stated he was told that "my big day with the Klan had finally come . . . . I had finally been elected to do the greatest deed of my life for the Klan. I asked him what it was and he told me he wouldn't know until the time came." Rowe's call to his contact agent on the morning of March 25 related this instruction. Rowe stated that his agent told him to go, but added, "but be careful because this sounds really big." Deposition, October 17, 1975 at 32–33. Rowe maintained, however, that he did not know that Mrs. Liuzzo and her companion were murder targets.

I honestly felt, in my heart, that we was going to go out there and felt we was going to beat the hell out of him [the black companion], because that's what we had been doing. I honestly felt that, in my heart. Dept. at 35.

The Senate Committee issued its final report in April of 1976. One of the prob-

---

4. Rowe's deposition testimony was not released by the Committee until after the Final Report was issued in 1976.

lems noted by the Committee in response to Rowe's testimony was that of the government's:

> participation or unseemly involvement through its paid and directed informants in the violent or criminal activity it is investigating. Senate Select Committee on Governmental Operations, Final Report, Book III at 239, April 23, 1976.[5]

Thus, in late 1975 and early 1976, Rowe for the first time disclosed that he did participate in acts of violence, and that this participation was known and approved by his contact agent. He also disclosed that the FBI was informed of planned violence, and only rarely, to Rowe's knowledge, took preventative steps. Moreover, the contents of Rowe's communication to his contact agent on the morning of March 25 were disclosed: Rowe was elected to perform the greatest deed of his life for the Klan; his big day had finally come.

*DISCUSSION*

The government contends that plaintiffs' suit is barred by reason of 28 U.S.C. § 2401(b), which provides:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

Plaintiffs filed their administrative claim with the FBI on October 12, 1977. No final disposition on this claim was made at the time they filed this suit on July 5, 1979.

In support of the motion to dismiss based on the statute of limitations, the govern-ment argues that, under § 2401(b), plaintiffs' cause of action "accrued" in 1965, either on the date of their mother's death or shortly thereafter. The government then contends that upon this accrual in 1965, plaintiffs were under a duty to use due diligence to discover the avenues of legal recourse available to them. According to the government, plaintiffs' failure to discover their cause of action within two years of 1965, although unfortunate, cannot be excused. Under § 2401(b), it is argued, plaintiffs' claim is "forever barred."

Plaintiffs argue that, although they knew of their injuries in 1965, their cause of action against the government accrued no earlier than December 2, 1975, the date on which information was first disclosed suggesting a causative link between their injuries and the federal government. Their failure to discover their cause of action, they argue, was caused, in part, and aggravated by the government's active concealment of information relevant to the circumstances of their mother's death. Thus, they argue, even exercising due diligence they could not have discovered their cause of action until Rowe testified at the Committee hearings on December 2, 1975.

■ Statutes of limitation, in general, serve an important purpose, and

> represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free from stale claims in time comes to prevail over the right to prosecute them." These enactments are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims,

---

**5.** The above summary does not include all the information which has come to light since 1975. Although a complete development of all of the information relevant to this case is beyond the scope of this opinion, three additional aspects of the Liuzzo case deserve mention. First, Rowe's deposition testimony reflects his belief that the Klansmen were successful in their attempt to kill not only Viola Liuzzo but also her black companion as well. He testified that Leroy Moten was not the man he saw in the Liuzzo car, although Moten testified at the criminal trials that he was the passenger. Second, an interview with Eugene Thomas and Collie LeRoy Wilkins for the ABC news television series "20–20" brought out their version of the Liuzzo murder: they stated that Rowe, using Thomas' gun, killed Mrs. Liuzzo. Finally, the state of Alabama convened a grand jury which, in 1978, returned a first degree murder indictment against Rowe. At the hearing on this motion, defense counsel informed the court that Rowe, a Georgia resident, has so far been successful in avoiding extradition to Alabama.

they protect defendants and the courts from having to deal with cases. in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise. *United States v. Kubrick*, —— U.S. ——, ——, 100 S.Ct. 352, 357, 62 L.Ed.2d 259 (1979). Citations omitted.

In the context of tort claims against the United States, moreover, it must be borne in mind that the Federal Tort Claims Act is a limited waiver of sovereign immunity, a waiver which should not be extended beyond that which Congress intended. *Id.*

In enacting § 2401(b), Congress directed tort claimants to present their claims within two years of the date on which their causes of action accrue. Thus, the crucial question in this case concerns when plaintiffs' cause of action against the United States accrued within the meaning of § 2401(b).

The Supreme Court has recently provided guidance on the issue of when a cause of action accrues in the context of federal tort claims. In *United States v. Kubrick, supra*, a medical malpractice plaintiff brought suit within two years of the date on which he learned that the treatment which caused his injury may have constituted malpractice, but more than two years after the date on which he had knowledge of both his injury and its cause. The Court was thus faced with the question of whether the plaintiff's cause of action accrued on the earlier date, when he had knowledge of his injury and its cause, or whether it accrued only on his awareness that he may have been legally wronged.

In concluding that the plaintiff's cause of action accrued on the earlier date, the Court distinguished between knowledge of injury and causation and knowledge of a legal wrong.

We are unconvinced that for statute of limitations purposes, a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask.

*Kubrick, supra*, at ——, 100 S.Ct. at 359.

The Court stressed that the purpose of § 2401(b) is to require the reasonably diligent presentation of claims, and stated that the postponement of accrual until a plaintiff is aware that his injury was negligently afflicted would undermine that purpose. The Court stated that on knowledge of injury and causation, a plaintiff can seek out advice as to whether his treatment conformed to the generally applicable standard of medical care.

But however or even whether he is advised, the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make. *Id.* at ——, 100 S.Ct. at 360.

■ Thus, in the area of medical malpractice, it is clear that a plaintiff's cause of action accrues within the meaning of § 2401(b) on his knowledge of his injury and the relevant facts about causation. It must be noted, however, that the general rule, outside the malpractice and latent injury area, has been that a cause of action accrues immediately upon the potential plaintiff's injury. See e. g., *Kington v. United States*, 396 F.2d 9 (6th Cir.), *cert. den.*, 383 U.S. 960, 89 S.Ct. 396, 21 L.Ed.2d 373 (1968); *Steele v. United States*, 599 F.2d 823 (7th Cir. 1979). If the pre-*Kubrick* general rule were applied in this case, it is clear that plaintiffs' suit would be time-barred, unless plaintiffs could assert a successful tolling argument based on the government's alleged fraudulent concealment of the relevant facts regarding their claims. On the other hand, if, as plaintiffs argue, *Kubrick*

applies in the context of this suit, it is possible that plaintiffs' claims are not time-barred. Application of *Kubrick* in such a way as to hold that plaintiffs' suit was timely filed, however, requires affirmative answers to two questions. First, does *Kubrick* apply outside the malpractice area? Second, does *Kubrick* apply to cases, like this one, in which the relevant facts about causation, unknown to the plaintiffs, concern who caused the injury rather than what caused the injury?

The Scope of *Kubrick:*

*Application to Non-Malpractice Cases*

The determination of when a cause of action accrues for purposes of § 2401(b) has often been made by ascertaining the "type" of case which is presented. Thus, in an "ordinary tort" case, the general rule that the claim accrues on the date of injury was applied, *Steele v. U. S., supra,* and in a "wrongful death" case, the same rule was also followed. *Kington v. U. S., supra.* Yet, "medical malpractice" cases have triggered a different response from courts which, recognizing the inherent unfairness of imposing the statute's time limitations regardless of when the injury is manifested, have fashioned the more liberal discovery rule applicable to malpractice tort claims against the government. This categorical approach to limitations defenses has not been altogether unwarranted. In most cases, plaintiffs are aware of the relevant facts as soon as they are injured, and, likewise, most cases which present a compelling situation in which to apply the discovery rule are malpractice cases.

■ Nonetheless, strict application of the various doctrines developed under § 2401(b) according to the type of case presented could impose harsh and, indeed, illogical consequences on any given plaintiff. *Kubrick,* this court believes, signals an end to the categorical approach to the statute of limitations, and teaches that the facts in each case must be thoroughly examined to determine when the plaintiff had knowledge of the "critical facts" regarding his injury. On this date, his claim accrues, and the plaintiff is charged with the duty of promptly investigating and presenting his claim. This court is aware of no reason why harsh consequences should be avoided in one category of cases and yet mechanically imposed in another. Rather, the rationale of *Kubrick* is broad enough to warrant, indeed compel, its application to a nonmalpractice case if the plaintiff in that case is ignorant of the critical facts concerning his injury.

The Scope of *Kubrick* :

*Causation*

■ In *Kubrick,* the Court had before it a case in which the plaintiff necessarily knew who caused his injury as soon as he learned what caused his injury. The cause of plaintiff's deafness in *Kubrick* was the treatment of his infection with neomycin, and there was no question regarding who administered the drug. Thus, the Court was not directly faced with the question of whether a plaintiff's ignorance of the identity of the person who caused the injury postpones the accrual of his cause of action. Nonetheless, the language and rationale of *Kubrick* indicate that ignorance of the "who" element of causation should, like ignorance of the "what" element of causation, postpone accrual of a cause of action, at least in certain circumstances.

As noted above, *Kubrick* drew a distinction between a plaintiff's ignorance of a legal wrong and ignorance of his injury and its cause. In so doing, the Court identified the "critical facts" that give rise to the accrual of a cause of action: that the plaintiff has been injured and who inflicted the injury. *Kubrick, supra,* at ——, 100 S.Ct. at 359. The rationale underlying the postponement of accrual until the plaintiff learns of both his injury and its cause rests on the Court's recognition that an injury may itself be latent, and facts about causation may be in the control of the putative defendant, "unavailable to the plaintiff or at least very difficult to obtain." Once armed with the knowledge of his injury and its cause, however, a plaintiff is able to investigate whether he has suffered an actionable injury. *Id.*

The *Kubrick* decision thus reflects a pragmatic reconciliation between two competing concerns. The first concern is to preserve the purpose of § 2401(b), that of requiring the reasonably diligent presentation of claims against the government. The second concern, as the language in *Kubrick* makes clear, is that of fixing the date of accrual of a claim at that point in time when the plaintiff can realistically be expected to undertake an investigation into the possibility of pressing a claim against the government. In *Kubrick*, the Court found that a malpractice plaintiff is able to conduct such an investigation when he acquires knowledge of his injury and its cause, and that postponement of accrual beyond this time would undermine the purpose of the limitations statute.

Based on the above, it is clear that a plaintiff's ignorance of the identity of the tortfeasor can be as critical an element to accrual as ignorance of what the tortfeasor did to cause the injury. Without knowledge of the identity of the tortfeasor, an injured party may be helpless to discover the relevant information about his injury, including whether the tortfeasor's conduct conformed to the standards required by law. Thus, the inquiries which *Kubrick* requires an injured party to make upon accrual of his claim may be foreclosed when he is ignorant of the identity of the persons responsible for his harm. Nonetheless, *Kubrick* clearly instructs that reasonable diligence is required in presenting claims against the government, and accrual of a cause of action cannot be postponed beyond the date on which the injured party has sufficient information to conduct an investigation into the merits of his claims.

In order to determine the date of accrual of plaintiffs' claims in this case, it is necessary to ascertain the *earliest* date on which plaintiffs had sufficient information to commence an investigation into whether they had a cause of action against the government. As a matter of law, the date of accrual cannot be postponed beyond this time, for to do so would undermine the purpose of § 2401(b).

An examination of the facts in this case reveals that plaintiffs were aware of their injury and its direct cause almost immediately upon its occurrence. This case presents an unusual factual situation, however, in that plaintiffs thought they knew who caused the injury as soon as they knew what caused their injury. Moreover, plaintiffs were not alone in their conception of the identities of the persons responsible for their mother's death. In 1965, the official version of the Liuzzo murder was that three Klansmen were solely responsible. Gary Rowe, by his testimony at three criminal trials, portrayed himself as a helpless witness to the murder, and clearly stated that he had no idea that the car chase would result in a murder attempt. Rowe's testimony was not refuted or supplemented by any government personnel in such a way as to give notice to plaintiffs that his story was anything but accurate. Rather, his version of the events of March 25 was tacitly approved: by President Johnson when he credited the FBI with solving the murder, and by various FBI agents who, in 1965, had knowledge of the information to which Rowe later testified before the Senate Committee, and yet took no steps to correct the story which the plaintiffs, as well as judges, jurors, and citizens of this country, were led to believe was true.

Defendant argues that the impeachment attempts by defense counsel in the criminal trials were sufficient to put plaintiffs on notice that they had a potential claim against the government. Affidavits submitted by two of the plaintiffs refute this argument. Although a mere suggestion of wrongdoing may, in some instances, provide an injured party with sufficient information to require him to investigate further, this court is of the opinion that both the source of the suggestion of wrongdoing and the context in which it was made must be considered. In this case, the suggestions that Rowe was involved in violence were made by counsel for the three Klan defendants in the criminal trials. One of the defense attorneys was a member of the very organization to which the defendants belonged, the organization viewed by many

as the direct cause of much of the violence against civil rights workers. Less credible sources for the true state of facts can scarcely be imagined, especially in view of the fact that Rowe consistently denied any wrongdoing.

The facts of this case amply demonstrate that plaintiffs had no reason to commence an investigation into governmental complicity in their mother's murder until 1975, when Rowe publicly testified regarding his violent activities as an FBI informer. Indeed, all indications, from the workings of the federal and state criminal justice systems to the public statements of President Johnson, led plaintiffs to the justifiable belief that those responsible for their mother's murder had been apprehended, tried, and incarcerated.

Under the circumstances of this case, it would be both unfair and unrealistic to hold that plaintiffs should have investigated their claims earlier, for they had no cause to do so. This case thus presents an instance in which knowledge of the identity of the tortfeasor is a critical element to the accrual of a claim. Until 1975, plaintiffs had no knowledge sufficient to put them on notice that the defendant or its agents may have caused their mother's death. Rowe's 1975 testimony provided the first direct information of possible governmental malfeasance, and plaintiffs' claims accrued no later, and no earlier, than this date. From December 2, 1975, plaintiffs had two years to determine whether they would file a claim against the government. This they did, and *Kubrick* requires no more.

This court is cognizant of the fact that pre-*Kubrick* decisions of lower courts have held that a plaintiff's ignorance of the identity of the tortfeasor does not excuse a delay of more than two years in pressing a tort claim against the government. While these decisions are not binding on this court, it is important to note that they are distinguishable from the situation presented by the *Liuzzo* case, and may, in fact, survive *Kubrick*.

One line of cases holds that where a plaintiff knows both who and what caused his injury, the plaintiff's ignorance of the fact that the tortfeasor was a government employee does not toll the statute of limitations. *Grix v. United States*, C.A. No. 74–72550 (E.D.Mich.1975); *Baker v. United States*, 341 F.Supp. 494 (D.Md.1972); *Lien v. Beehner*, 453 F.Supp. 604 (N.D.N.Y.1978). These cases stand for the proposition that when an injured party has knowledge as to who as well as what inflicted his harm, it is not unreasonable to impose on him the obligation to investigate the "legal" identity of the tortfeasor, or whether any entity is vicariously liable for the tortfeasor's conduct. *Kubrick* appears to sanction the results reached in these cases, because once a plaintiff has knowledge as to the identity of the tortfeasor he has sufficient information to commence an investigation of the tortfeasor's employment status, corporate status, and other legally recognized affiliations. Indeed, this is the type of inquiry that most tort plaintiffs make as a matter of course. If accrual of a plaintiff's claim in this situation were postponed, the purpose of the limitations statute would be undermined—a result that *Kubrick* expressly forbids.

The difference between the facts of the *Liuzzo* case and the facts of the cited cases is readily apparent. In this case, the plaintiffs lacked knowledge of the identity of the persons they now allege to be tortfeasors and the fact that the alleged tortfeasors may have been culpably involved in the killing, as well as their status as governmental employees. In the cited cases, the plaintiffs were ignorant of only the latter. Thus, unlike the plaintiffs in *Grix, Baker* and *Lien*, the plaintiffs in this case had no starting point from which to commence an investigation. Under *Kubrick*, a cause of action accrues at the earliest point at which a plaintiff has knowledge of the critical facts surrounding his injury such that an investigation is both warranted and realistically possible. For the *Liuzzo* plaintiffs, this was in 1975, when they learned that tortfeasors other than the three Klansmen could possibly have been implicated in their mother's death.

Another case holding that ignorance of the identity of the tortfeasor does not toll

the statute of limitations is *Steele v. United States*, 599 F.2d 823 (7th Cir. 1979). In *Steele*, the plaintiff was injured while installing lights on an inactive runway at Chicago's O'Hare Airport. When he connected the wires to the transformer box, he received a severe shock because the current to the box was on. The plaintiff in *Steele* sought to excuse his delay of 25 months in filing his claim against the government, arguing that for two months after the accident he did not know, and in the exercise of reasonable diligence could not have known, that the Federal Aviation Administration maintained a remote power switch to the transformer. The court reviewed the procedural history of Steele's claims, and expressed some doubt as to whether Steele was truly ignorant of the power switch. *Steele* at 829, note 9. Apart from this, however, the court declined to apply the "due diligence-discovery" rule applicable to malpractice claims to the "ordinary tort" situation presented by Steele's claims. The court instead followed the general rule which states that when an injury coincides with a negligent act, and some damage is discernible at that time, the cause of action accrues and the statute starts running. *Steele*, at 828.

The facts as reported in the *Steele* decision give no indication of what obstacles, if any, prevented the plaintiff from discovering the existence of the FAA's power switch. Assuming there were none, the *Steele* decision is not necessarily irreconcilable with *Kubrick*. Where a person is injured because of conduct known to be wrongful relative to a potentially dangerous physical object, that person has information adequate to investigate who had control over the object. The scope of such an investigation has a focal point, and is necessarily limited to that class of entities which had the reason, opportunity and means to exercise control over the object.

Unlike the situation in *Steele*, the plaintiffs in this case had no reason to investigate the cause of their mother's death in 1965, because, based on the information known at that time, they believed and were led to believe the cause to be the three Klansmen. Moreover, even if they had had

reason to investigate further in 1965, it is not clear that the FBI should reasonably have been a target of their inquiries. In the absence of any indication of wrongdoing, this court will not impose on plaintiffs the retroactive duty to investigate the very organization credited with solving their mother's murder, merely because one of its agents was present at the scene of the crime.

This court is persuaded that the facts of this case present a situation which, under *Kubrick* and the prior lower court decisions, excuses plaintiffs' delay in pressing their claims. Plaintiffs' ignorance of the identities of the persons responsible for their mother's death prevented them from conducting the investigation which *Kubrick* requires plaintiffs to make upon accrual of their claims. Indeed, based on what was known in 1965, they had no reason to suspect that an investigation was even warranted. Thus, their claims accrued no earlier than December 2, 1975, the date on which they obtained knowledge that the defendant's agents were possibly implicated in the murder. Because they filed their administrative claims within two years of the date on which their claims accrued, § 2401(b), as interpreted by *Kubrick*, does not bar their claims.

Finally, it is important to remember that the issue in this case is a narrow one involving the accrual of claims under a congressionally enacted statute of limitations for tort claims filed against the United States. This decision is not a discussion of the correct or incorrect methods of crime investigation or law enforcement. It is not an effort to either condemn or praise any particular law enforcement agency for the methods it believes to be necessary to prevent and investigate crime. What is involved in this case as it relates to crime prevention and investigation is only the holding that activity that tends to hide the participation of government related personnel in torts that occur in the course of their duties may provide a longer time to those injured to make claims than would be true if other methods were used. The longer period of time having been granted, the

ultimate issue of liability remains yet to be determined.

For the foregoing reasons, defendant's motion is denied.

So ordered.