**Ruth YUSTICK, Plaintiff,**

v.

**ELI LILLY AND COMPANY, Defendant.**

Civ. A. No. 80–70889.

United States District Court, E.D. Michigan, S.D.

Nov. 9, 1983.

---

1559

Goodman, Eden, Millender & Bedrosian by James A. Tuck, Detroit, Mich., for plaintiff.

Dickinson, Wright, McKean, Cudlip & Moon by John E. Scott, Detroit, Mich., for defendant.

## OPINION

GILMORE, District Judge.

This is a products liability diversity action for injuries allegedly sustained as a result of the ingestion of diethylstilbestrol (DES) by plaintiff's mother while she was pregnant with plaintiff in 1952. In January 1973, plaintiff became aware of her alleged injuries and that the generic drug DES was involved. Despite diligent efforts, she did not discover until August 1979 which of the several DES manufacturers selling the drug had actually manufactured and sold the drug her mother consumed. The instant lawsuit was filed on February 8, 1980.

The issue is when plaintiff's cause of action accrued, and the case is before the Court on defendant's motion to dismiss because of the running of the statute of limitations.[1] The Court finds that the stat-

---

1. All parties agree that the applicable statute here is M.C.L.A. § 600.5805(9), which provides for a three-year limitations period in product liability actions. Eli Lilly & Company argues that, under the best theory available to plaintiff, the statute began to run in November 1976, and thus expired in November 1979, making this action untimely. Plaintiff maintains that the statute did not begin to run until the summer of 1979.

ute of limitations did not accrue until plaintiff had the opportunity, after making reasonably diligent efforts, to identify the manufacturer of the drug in question, since the identity of the alleged tort-feasor is a "critical fact" or essential element in this cause of action.[2] The motion to dismiss will therefore be denied.

## I

While pregnant in 1952, plaintiff's mother took DES supplied by Dr. John Comstock.

On December 14, 1972, plaintiff was examined as an outpatient of the University of Michigan Hospital. In January 1973, she was admitted to the University Hospital and underwent a vaginal biopsy. Vaginal adenosis, related to her mother's ingestion of DES during her pregnancy with plaintiff, was discovered. At this time, plaintiff knew of her alleged injuries and their relationship to her mother's ingestion of DES while pregnant.

In September 1976, plaintiff retained counsel and on September 16, 1976 plaintiff's counsel wrote to the University of Michigan Hospital requesting plaintiff's medical records for January 1973, and, on November 2, 1976, the hospital provided counsel with a complete copy of plaintiff's medical records, including her January 1973 records. Plaintiff's mother's medical records from Dr. Comstock were also obtained in November of 1976.

On December 2, 1976, a physician at the University of Michigan Hospital wrote to plaintiff's counsel, describing plaintiff's injuries as diagnosed, and her mother's ingestion of DES.

In 1977, plaintiff filed suit in Oakland County Circuit Court against Dr. Comstock, which was later settled. After filing that suit, and before its settlement, plaintiff's counsel had conversations with representatives of the insurance company insur-

ing Dr. Comstock and requested them to identify the manufacturer of the drug that Dr. Comstock distributed from his office in 1952. In late 1977 and early 1978, plaintiff's counsel was informed that neither Dr. Comstock nor his office knew the identity of the manufacturer of the DES.

At the same time, plaintiff's counsel was in communication with plaintiff's parents and requested them to attempt to identify the manufacturer. These inquiries produced no helpful information prior to the summer of 1979.

In the summer of 1979, plaintiff's father, while cleaning the attic of his house, found a bottle containing pills prescribed for plaintiff's mother. These pills were presented to plaintiff's counsel on August 1, 1979, and plaintiff's counsel stated that he confirmed that the manufacturer of the pills was defendant Eli Lilly & Company. The instant action was commenced on February 8, 1980.

## II

The background of DES is described vividly in Comment, *DES and a Proposed Theory of Enterprise Liability,* 46 Fordham Law Review 963 (1978), (hereinafter cited as *Fordham Comment*). There it is pointed out:

[DES] is a man-made estrogen, first approved by the Federal Drug Administration (FDA) in 1947 for use in complications during pregnancy—specifically, to prevent miscarriages. Between the years 1947 and 1971, DES was manufactured by hundreds of drug companies and popularly prescribed for millions of pregnant women. In 1971, the medical literature reported a statistically significant association between the use of DES, or of chemically similar synthetic estrogens manufactured during the same period, and the subsequent development of

---

**2.** There is no question but that plaintiff's attorney was diligent in his efforts to find the identity of the manufacturer from the time it was established that the DES was the cause of plaintiff's difficulty. He repeatedly wrote to doctors and drug companies attempting to find out the manufacturer of the drug. The manufacturer

eventually was fortuitously identified when plaintiff's father cleaned out the attic of his home. In view of the holding of the court, it is extremely significant that the plaintiff made all reasonable efforts to ascertain the identity of the manufacturer of the drug.

cancer in the users' daughters, exposed to the drug in utero. A small percentage of the estimated one-half million or more DES daughters are presently suffering from clearcell adenocarcinoma of the vagina and uterus, heretofore rare and sometimes fatal forms of cancer. The vast majority have other abnormalities, which may be pre-cancerous. In 1971, the FDA, contraindicating DES for use by pregnant women, effectively banned it for this purpose both because of its danger and ineffectiveness.

Several hundred daughters, some with cancer and some with possibly pre-cancerous conditions, are plaintiffs in an estimated eighty to one hundred DES cases presently pending in the United States. Most of the major drug companies are defendants. Plaintiffs allege that defendants insufficiently tested DES and sold it without warning, when they knew or should have known it was both ineffective and unsafe for use by pregnant women.

*Id.* at 963–67 (Footnotes omitted).

DES was originally tested and approved in the late 1940's by the Food and Drug Administration. There are no official records of who manufactured the drug after its approval, for any drug company could do so without notifying the FDA. The estimates range from 200 to 300 drug companies, although three or four companies, including defendant, made 90 percent of the DES. *See Fordham Comment, supra* 964, n. 3, 977.

Plaintiff's problem in not knowing until 1979 who manufactured the drug is not unique. The same problem is faced by hundreds of women throughout the country, and theories of industry-wide liability have been developed by some courts to confront this type of problem.

In face of plaintiff's problem in this case, and many other similar cases around the country, courts have elaborated various theories to deal with tort liability in a situation where an industry has clearly created a problem, but where it is extremely difficult to identify the particular manufacturer. For want of a better term, they can be classified as theories of "industry-wide" liability.

The Michigan Court of Appeals in *Abel v. Eli Lilly & Company,* 94 Mich.App. 59, 289 N.W.2d 20 (1979), *leave to appeal granted* 410 Mich. 869 (1980), and the California Supreme Court in *Sindell v. Abbott Laboratories,* 85 Cal.App.3d 1, 149 Cal. Rptr. 138 (1978), have been part of this trend and based their holdings on expansions of traditional tort doctrines of concerted action and alternative liability, exemplified by the well-known case of *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948). How "traditional" these doctrines are remains to be seen, especially in Michigan, where the Michigan Supreme Court has not yet spoken on the subject. *See* discussion, *infra* at 1565.

A broader theory, called "enterprise liability" has been proposed by some commentators, finding support in *Hall v. E.I. DuPont De Nemours & Co., Inc.,* 345 F.Supp. 353 (E.D.N.Y.1972). This theory has never been applied in DES cases and was specifically disclaimed in *Abel,* 94 Mich.App. at 77, 289 N.W.2d at 27, although the precise distinctions between these theories remains unclear.

### III

Statutes of limitation are substantive and therefore state law applies here. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The Court must also look to Michigan law to ascertain when the cause of action accrued. *Johnson v. Railway Express Agency, Inc.* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).[3] Moreover, the burden of proof in a

---

**3.** Where there is no Michigan Supreme Court or Court of Appeals case directly on point, as here, the Court must look to relevant federal and state decisions for guidance. Prior to writing this opinion, this Court certified the question involved here to the Michigan Supreme Court in the hope that that court would decide the signif-

icant issues of accrual of the statute of limitations in Michigan. After considering the matter for several months, the Supreme Court, in a one-paragraph order, declined to answer the question. *In Re Certified Question, Yustick v. Eli Lilly & Co.,* 417 Mich. 1106, 330 N.W.2d 689 (1983).

motion to dismiss based on the statute of limitations is on the moving party. *See Akron Pressform Mold Co. v. McNeil Corp.,* 496 F.2d 230 (6th Cir.1974), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270.

■ Under Michigan law, the statute of limitations begins to run when "all of the elements of an action for personal injury, including the element of damage, are present." *Connelly v. Paul Ruddy's Equipment Repair & Service Co.,* 388 Mich. 146, 151, 200 N.W.2d 70, 72 (1972). The elements which must be present are:

(1) The existence of a legal duty by defendant towards plaintiff.

(2) The breach of such duty.

(3) A proximate causal relationship between the breach of such duty and an injury to the plaintiff.

(4) The plaintiff must have suffered damages.

*Id.* at 150, 200 N.W.2d 72.

Plaintiff argues that this Court must construe *Connelly* to find that the statute of limitations does not begin to run until the existence of a legal duty by a *particular* defendant is known, because to hold otherwise would effectively bar judicial recourse for many injuries. Defendant, on the other hand, maintains that plaintiff did not need to know the identity of the particular manufacturer in order to obtain judicial relief because she could have filed suit against all potential manufacturers under some type of "industry-wide liability" theory, and thus had all the elements of her cause of action in 1976.

In *Connelly,* the Michigan Supreme Court succinctly stated the long-established elements of traditional tort claims which have been adopted in almost all jurisdictions. The real purpose of *Connelly* is not to provide some kind of "talisman" but to provide a framework for the court to undertake an analysis of a tort's "accrual problems" in the framework of developing tort law and tort principles.

The problem here is one of accrual in products liability cases. In such cases, injuries often take place long after the original purchase or use of the product, and the plaintiff may be aware that he or she has suffered injuries but unaware of what or who caused the injury. Or, the plaintiff may be aware of the injury and who or what caused the injury but unaware that a legal wrong was involved, that is, aware that a drug injured him but not aware that a defendant was negligent or breached its implied warranty. Finally, the plaintiff may be aware of injury, what caused it, that a legal wrong had occurred, but not who was responsible. The latter incident is this case.

■ Under Michigan law, the discovery of the injury is the earliest possible date for accrual of the statute. It is clear that plaintiff's claim did not accrue in 1952 when the mother took the drug. The question here is whether plaintiff's cause of action accrued after discovery of her injury but before she knew the identity of the alleged tort-feasor. This Court concludes that plaintiff's claim did not accrue within the meaning of the *Connelly* test until plaintiff discovered the identity of the alleged tort-feasor, Eli Lilly & Company.

### IV

In a products liability case such as this where the critical factor in bringing a DES claim is the identity of the drug manufacturer, and where it is well recognized that such identity is an extremely difficult, if not often impossible, task, and where a plaintiff has made reasonably diligent efforts to identify the tort-feasor, it cannot be said that all of the elements of the cause of action are present until the identity of the tort-feasor is established.

■ As a general rule, the defendant must be identified as responsible for the product which caused the injury before a cause of action accrues.[4] *See O'Donnell v. Geneva Metal Wheel Company,* 183 F.2d

---

**4.** *See* Annot.: Products Liability: Necessity and Sufficiency of Identification of Defendant as

Manufacturer or Seller of Product Alleged to Have Caused Injury, 51 A.L.R.3d 1344.

733 (6th Cir.1950), *cert. denied* 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342 (1951). This is because of the requirement that the defendant be the cause in fact of plaintiff's injury. "It is self-evident that the defective product must be shown to have come from defendant rather than some other manufacturer, for if defendant has neither acted negligently nor breached his implied warranty he can incur no liability." *Abel v. Eli Lilly & Co.*, 94 Mich.App. at 70, 289 N.W.2d at 24.

Additional support for this proposition is found in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), and two recent district court opinions in Michigan interpreting *Kubrick.* Although *Kubrick* and the Michigan cases dealt with interpretations of the Federal Tort Claims Act and do not involve products liability cases, their reasoning is persuasive.

In *Kubrick,* a medical malpractice claim brought under the Federal Tort Claims Act, the Supreme Court held that a claim "accrues" when the plaintiff knows both of the existence and the cause of his injury, and not at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice. What is important in the analysis of this matter is that the Supreme Court focused on a factual analysis in determining when a cause of action accrues and when it is fair to hold a plaintiff to the running of the statute of limitations. "The prospect is not so bleak for a plaintiff in possession of the *critical facts* that he has been hurt and *who* has inflicted the injury." (emphasis added). *Id.* at 122, 100 S.Ct. at 359. This line of reasoning is fully consistent with the analysis of *Connelly.* An examination of the "critical facts" is needed by a plaintiff to establish the presence of "all of the elements" that "can be alleged in a proper complaint" under *Connelly.*

The Supreme Court indicated in *Kubrick* that the identity of the tort-feasor is a critical fact, and two recent Michigan district court cases have so held, following the reasoning of *Kubrick. See Liuzzo v. United States,* 485 F.Supp. 1274 (E.D.Mich. 1980), and *Bergman v. United States,* 551 F.Supp. 407 (W.D.Mich.1982). Both cases held that the identity of a tort-feasor was a "critical fact" essential to determining when a plaintiff's cause of action has accrued.

■ Here, where it was impossible for the plaintiff to ascertain the identity of the tort-feasor at the time the drug was bought and taken (1952), where the alleged harmful affects of the drug did not become manifest until some 20 years later, where plaintiff took all the reasonable steps to find the identity of the manufacturer and took all steps within her power to preserve her legal rights, plaintiff's cause did not accrue under Michigan law until August 1979 when she learned the identity of the manufacturer, the "critical fact" that gave her all of the elements of her cause of action, in particular, element (1) in the *Connelly* test, the existence of a legal duty by *defendant.* "To hold otherwise would transmute the statute from one of limitation into one of abolition." *Malesev v. Wayne County Road Comm'rs,* 51 Mich. App. 511, 513, 215 N.W.2d 598, 599 (1974).

## V

Defendant strongly urges that a line of cases in the Michigan Court of Appeals, especially *Thomas v. Ferndale Laboratories Inc.,* 97 Mich.App. 718, 296 N.W.2d 160 (1980), and *Pendergast v. American Fidelity Fire Insurance Co.* 118 Mich.App. 838, 325 N.W.2d 602 (1982), are controlling and require dismissal of plaintiff's complaint.

The Court is of the opinion that these cases are factually distinguishable and do not clearly rest upon an interpretation of the *Connelly* principle. Moreover, their results can be reconciled with the Court's holding here.

*Thomas* was a DES case. In 1973, plaintiff became aware of her cause of action and in May 1974 filed suit naming Eli Lilly as a defendant. In September 1974, she was advised that Ferndale Laboratories, not Lilly, had manufactured the DES, and the suit against Eli Lilly was dismissed for no progress in February 1975. In May 1977, plaintiff filed suit against Ferndale

Laboratories, and the Court of Appeals held the claim was barred by the statute of limitations because plaintiff's claim had accrued in 1973 when she became aware of her cause of action.

The *Thomas* panel did not rely on *Connelly*, nor even cite it or any Michigan Supreme Court authority. It relied primarily on *Walerych v. Isaac*, 63 Mich.App. 478, 234 N.W.2d 573, *leave to appeal denied* 395 Mich. 776 (1975), where the Court of Appeals stated: "Plaintiff in this case knew by at least December, 1971, that there might be a cause of action against certain physicians .... The issues of professional knowledge and reasonableness are not present. Discovery of the identity of an alleged tort-feasor is no more difficult when the wrong alleged is malpractice." *Id.* at 481, 234 N.W.2d at 575.

The reliance on *Walerych* and lack of citation to *Connelly* indicates the basis of the *Thomas* decision. The court was not taking a categorical approach to the *Connelly* "accrual" test, but was carefully examining the facts. The *Walerych* case is clearly a case of lack of diligence by a plaintiff. There was no reason why, in two years, the identity of the doctors could not have been discovered. The facts there are a far cry from this case where it was an extremely difficult task to identify the alleged tort-feasor. *Thomas* is also a lack of diligence case. After being advised in September 1974 that Ferndale Labs, not Eli Lilly, made the drug, plaintiff waited until May 1977 to file suit against Ferndale. There was simply no reason to give plaintiff the benefit of an expansive view of accrual in that case.

*Pendergast* is also distinguishable. This involved the one-year statute of limitations for claims against insurers under the Michigan no-fault insurance statute. Plaintiff initially filed a claim against an insurer within the one-year period, and then later found out that another insurer was responsible. By then the statute had run and the case was dismissed. The Court of Appeals upheld the dismissal.

Plaintiff contended that a due diligence exception should be made and that the stat-ute should be tolled while a plaintiff makes diligent efforts to find the identity of the insurer. The court rejected that argument, stating: "No Michigan appellate court has held that the limitation period in § 3145 is tolled until the plaintiff completes a diligent search." *Id.* 118 Mich.App. at 842, 325 N.W.2d at 604. The court cited *Ferndale Laboratories*, but did not cite *Connelly*, or state that this was a categorical interpretation of the *Connelly* rule. In fact, the holding was very specific as to the no-fault statute.

The facts are distinguishable. First, even though the opinion did not rest on these grounds, there was clearly a dispute whether plaintiff made diligent efforts to find the real insurer. Second, the difficulty Pendergast had in finding the identity of an automobile insurance company, knowing the identity of the person who hit him, is worlds apart from plaintiff's difficulty in finding the identity of the manufacturer of the DES. In *Pendergast*, the plaintiff never bothered to even ask the person who hit him who his insurance company was. Third, the no-fault statute, as the court pointed out, is a very specific legislative remedy with a very specific purpose. There was every basis for the court to view a legislative intent to construe the statute of limitations against the plaintiff. There is no indication that such legislative intent is present in personal injury or breach of warranty statutes of limitation.

Finally, the result in *Pendergast* is thoroughly in keeping with the analysis of this case. The court noted that under the no-fault statute a plaintiff who does not know the identity of the insured tort-feasor has a remedy through an assigned claims plan under M.C.L.A. § 500.3174. 118 Mich.App. at 843, 325 N.W.2d at 605. This is very crucial to any analysis under *Connelly*. Under Michigan's no-fault statute, the plaintiff has a remedy regardless of the identity of the insurer. Thus, all of the elements of a cause of action had accrued and could be alleged in a proper complaint before she knew who the real insurer was. Plaintiff in *Pendergast* had all of the crit-

ical facts in her possession necessary to bring a viable claim.

It therefore follows Yustick's cause of action did not accrue until Yustick knew the identity of the defendant, or in the exercise of reasonable diligence could have discovered the identity of the defendant.

## VI

Defendant attempts to meet plaintiff's contention that she could not have filed a claim prior to knowing the identity of the tort-feasor by pointing to the Michigan Court of Appeals decision in *Abel v. Eli Lilly & Company, supra*, and the California Supreme Court decision in *Sindell v. Abbott Laboratories, supra*, which allowed plaintiffs to go to trial in DES cases without alleging the specific manufacturer of the drug that injured them under two different industry-wide liability theories: 1) a "concert of action" theory, and 2) an "alternative liability" theory. Defendant argues that, like the plaintiffs in *Abel* and *Sindell*, Yustick could have named several drug manufacturers and would have had a viable cause of action under the *Connelly* test without knowing the identity of the tort-feasor. *Abel* is now on appeal to the Michigan Supreme Court, and the court has yet to define the limits of industry-wide liability for Michigan.

Aside from the fact that this argument is somewhat misplaced by defendant, given the fact that defendant Lilly vigorously argued against the theory both in the Michigan Court of Appeals and the Michigan Supreme Court in *Abel v. Eli Lilly & Company*, this argument is not persuasive in several respects.

First, it is made totally with the benefit of hindsight. During the period that plaintiff was possibly able to bring such a suit, from 1976 to 1979, class action DES cases had been brought throughout the country and had been uniformly rejected by lower courts,[5] including the Wayne County Circuit Court where *Abel* was filed. Industry-

wide liability was not in any precedential sense a viable theory in Michigan until December 1979 when *Abel* was decided by the Court of Appeals.

*Abel* has not yet been decided by the Michigan Supreme Court. Furthermore, even if *Abel* is affirmed by the Supreme Court, the case has been pending since 1974 and has not yet gone to trial. Many difficulties still remain regarding the viability of this theory in actual trial.

Nor is this a case where plaintiff's counsel was simply unaware of this alternate approach. He is a skillful attorney well aware of the *Abel* decision, and he made a conscious choice, with the consent of his client, not to pursue that remedy. Given the unclear nature of the state of the law at the time, and still today, this Court cannot challenge his decision.

It should also be noted that *Abel* provides no justification for a "shotgun" approach. A plaintiff cannot simply name all of the drug manufacturers he knows and file suit. The "concert of action" theory requires specific allegations on a factual basis. The "alternative liability" theory similarly requires allegations and factual basis against many defendants. There is no basis in this record to hold Yustick to this burden.

It therefore follows that to grant defendant's motion here because of a tenuous theory of industry-wide liability not yet endorsed by the Supreme Court of Michigan and subject to varying interpretations in circuit courts throughout the state would be unjust. Plaintiff has a right to proceed with her lawsuit and to name the defendant under the rationale of *Connelly*.

## VII

Today's decision is in keeping with the equitable principles underlying the statutes of limitation, which is to allow a plaintiff his day in court, but also to protect defendants and courts from having to deal with

---

**5.** *See e.g., Rheingold v. E.R. Squibb & Sons, Inc.,* No. 74 Civil 3420 (CHT) (S.D.N.Y. Oct. 14, 1975); *Fields v. Eli Lilly & Co.,* No. C 122248 (Cal.Super.Ct. Dec. 1977); *Rogers v. Abbott Labs.,* No.

61220 (Cal.Super.Ct.1977). *See* cases cited and discussion, Fordham Comment, *supra* at 972–73, nn. 28–29.

cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

 Delaying the accrual of a personal injury cause of action is an equitable question which compels balancing the plaintiff's right to seek redress for injury incurred against defendant's reasonable expectation of the duration of its exposure to liability, as well as possible prejudice to defendant due to delay. Here the balance clearly is in plaintiff's favor. Statutes of limitation are meant to protect defendants against stale claims, not to bar plaintiffs who have acted in good faith. *Insurance Co. of North America v. Forty-Eight Insulations, Inc.* 633 F.2d 1212, 1220 (6th Cir. 1980), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

Defendant has not seriously argued nor introduced any facts indicating any actual prejudice or even possible prejudice to it if this case is allowed to proceed. Eli Lilly has been defending DES suits for over a decade, and the issues in this case, especially its basic defense concerning safety, testing, etc. of DES, have been well researched, prepared and defended by Eli Lilly in countless lawsuits throughout the country, and by the particular counsel for defendant, an able and skilled trial attorney. There is certainly no surprise to Eli Lilly that it will have to defend another DES suit.

Plaintiff has also been preparing for this lawsuit since 1976 when she initiated the suit against the doctor. She is represented by skilled counsel, and there is simply no reason to believe that this case cannot be speedily, adequately, and fairly tried before this Court without prejudice to the defendant.

This is not a case where potential liability is being extended into infinity. Plaintiff's complaint was filed only two months after the cut-off date proposed by defendant. It is also worth noting that, although this complaint was filed in February 1980, defendant's motion for summary judgment on the basis of the statute of limitations was not filed until January 1982, almost two years later and just two weeks before the motion cut-off, two months before the final pre-trial conference, and five months before the case was set to go to trial. The record shows that full discovery has been conducted. There is no evidence that Eli Lilly has been unable to prepare and defend this claim because it is "stale."

Finally, there are important policy reasons for allowing Yustick to bring her claim here. Courts in general have been extending "discovery" principles in tort law to deal with the new and different injuries present in modern society. The problem of injuries from unknown sources appearing far in the future, affecting individuals not yet born, is a grave social problem. This is especially true in this case where the plaintiff, as yet unborn when her mother took the drug, bears no responsibility for knowing the identity of the manufacturer at that time.

With respect to any examination into Lilly's reasonable expectations of the duration of its exposure to liability, it must be noted that drug companies are unique among potential tort-feasors. The harmful effects of its drugs are not always known at the time they are marketed, and often much time passes before the harmful effects of drugs are manifest and before an injured person is able to discover the causal connection between the injury and the drug consumed. This Court does not think the drug companies can reasonably expect to be immune from suit before its customers or, in this case, their children have a fair opportunity to discover the company's tortious conduct. In drug cases, most of the evidence necessary to prove or defend against liability is likely to be documentary in nature, not the kind that is lost or becomes unreliable as time passes. Companies maintain records of the testing of their drugs, and hospitals maintain records. The passage of time in drug cases also increases the amount of scientific knowledge concerning the drug and its alleged harmful effects. In fact, the passage of time here undoubtedly will aid the eventual fact-finder in finding the truth in this case.

Defendant has the burden of proof on this issue, and its motion to dismiss on the basis of the statute of limitations is not based upon clear Michigan precedent, nor is it consistent with the equitable principles underlying the policies behind the statute of limitations. The motion to dismiss is therefore denied.

Plaintiff may present an order embodying the findings of this opinion, and counsel will immediately communicate with the Clerk of this Court to obtain a date for a final pretrial conference in this matter.