For all of the foregoing reasons, judgment will be granted to each defendant.

Walter BERGMAN and Frances
Bergman, Plaintiffs,

v.

UNITED STATES of America, Clarence M. Kelley, individually and as Director of the Federal Bureau of Investigation and as successor to J. Edgar Hoover, Former Director of the Federal Bureau of Investigation; Richard Held, individually and as Assistant Director of the Federal Bureau of Investigation; Barrett G. Kemp, individually and as a former employee of the Federal Bureau of Investigation, Thomas J. Jenkins, individually and as a former employee of the Federal Bureau of Investigation and four unknown agents of the Federal Bureau of Investigation, Defendants.

No. G 77–6.

United States District Court,
W.D. Michigan, S.D.

Nov. 19, 1982.

**4.** A party seeking to establish that a broadcaster has violated the fairness doctrine "must show that specific programs have dealt with controversial issues . . ., and if so, that other programs on the station have not balanced the coverage by presenting alternative viewpoints." *Hale v. F.C.C.*, 425 F.2d 556, 558 (D.C. Cir.1970). Furthermore, the administrative complaint must point to imbalance in the coverage of a controversial issue of public or general interest. "[T]he Fairness doctrine was not designed for the purpose of providing a forum for the discussion of mere private disputes of no consequence to the general public." *Handling of Public Issues Under The Fairness Doctrine*, 48 F.C.C.2nd 1, 39 Fed.Reg. 26,372 (1974). Plaintiff will therefore be hard pressed to demonstrate as an initial matter how the information which he seeks to have aired concerns anything but a mere private dispute.

William Goodman, Neal Bush, Detroit, Mich. (Kenneth Weidaw, II, of counsel, Grand Rapids, Mich.), for plaintiffs.

R. Joseph Sher, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., John Smietanka, U.S. Atty., Grand Rapids, Mich., for defendants.

## MEMORANDUM OPINION

ENSLEN, District Judge.

Plaintiffs' filed this civil action on January 4, 1977 against several named and unnamed Federal Bureau of Investigation (FBI) agents, in their individual and official capacities, and the United States government, seeking damages and declaratory relief for alleged violations of their rights arising under the First, Fourth, Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the Constitution, under Title 42 of the United States Code, §§ 1983, 1985(3) and 1986, and under the Federal Tort Claims Act.[1] Jurisdiction is premised upon 28 U.S.C. §§ 1331(a), 1343(3) and (4), and 1346(b).

The matter is presently before this Court on Defendants' Motion to Dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure alleging,

*inter alia,* that Plaintiffs have failed to state a claim upon which relief can be granted and that, in any event, Plaintiffs' claims are barred by the applicable statutes of limitations.[2]

## Background

This case arises from incidents which occurred in the so-called "Freedom Rides" of 1961. The Congress for Racial Equality (CORE) decided, in the spring, to send a bus or buses of "Freedom Riders" through several southern states, including Alabama, for the purpose of challenging, by non-violent means, segregation in public and private facilities which catered to, and served, interstate commerce. This challenge was to be carried out by the Freedom Riders' (a racially mixed group), integration of such facilities. Plaintiffs Walter and Frances Bergman were "Freedom Riders", and were on a bus which crossed the state line from Georgia to Alabama with several intended stops. The group on the bus consisted of black and white men and women and also included, among others, James Peck. Violent criminal enterprise was undertaken by known and unknown individuals, during the "Freedom Ride" in Anniston and Birmingham, Alabama. The injuries complained of by Plaintiff Walter Bergman were alleged to have been suffered by him in Anniston, Alabama, while the bus was stopped and, perhaps, in Birmingham as well. The injuries complained of by Frances Bergman, both direct and vicarious, also allegedly occurred at both locations. Since the filing of this suit Frances Bergman has died. The injuries claimed by both are more fully set

---

1. 28 U.S.C. §§ 1346(b) and 2674.

2. Although Defendants' Motion was filed pursuant to Rule 12(b), materials outside the pleadings have been submitted for my review, and since I have considered such materials, the pending motion must be treated as a Rule 56 Motion, for Summary Judgment. See Rule 12(b) and (c). Summary judgment is appropriate only where no genuine issue of material fact remains to be decided and the plaintiff or defendant is entitled to judgment as a matter of law. *See, Willetts v. Ford Motor Company,* 583 F.2d 852, 855 (CA 6 1978); *Felix v. Young,*

536 F.2d 1126, 1130 (CA 6 1976); Federal Rules of Civil Procedure 56(c). A court may not resolve disputed questions of fact in a summary judgment decision; *see United States v. Articles of Device... Diapulse,* 527 F.2d 1008, 1011 (CA 6 1976), and if a disputed question of fact remains, the court should deny the Motion for Summary Judgment and proceed to trial. *See, Felix v. Young, supra,* at 1030; *Bohn Aluminum & Brass Corporation v. Storm King Corporation,* 303 F.2d 425, 427 (CA 6 1962). These guidelines will be adhered to as the substantive issues of these motions are examined.

forth in the pleadings in this matter, and a more lengthy account of the events which occurred in Anniston and Birmingham is set forth in *Peck v. United States,* 470 F.Supp. 1003 (S.D.N.Y.1979).

### The Peck Case

In a scholarly and erudite opinion, Judge Stewart in *Peck, supra,* discussed Peck's constitutional, statutory and common law claims. Among other holdings, Judge Stewart opined that a § 1986 claim was stated against the individual defendants, and against the United States. In so ruling, Judge Stewart was of the opinion that a substantial question as to whether the § 1986 action was barred by the statute of limitations existed and, therefore, deferred decision on that issue until the parties completed "additional discovery."

Judge Stewart dismissed plaintiff's claims asserted under 42 U.S.C. § 1983, and § 1985(3), and concluded that Peck could not proceed under his claim based upon the Federal Tort Claims Act inasmuch as the law does not impose a duty to warn on the defendants; nor could Peck proceed under a *Bivens* theory since Peck could obtain complete relief under 42 U.S.C. § 1986. *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Previously, and in an apparently unpublished opinion, Judge Stewart dismissed Peck's claims for declaratory relief and all claims as to defendants William H. Webster and Clarence Kelley.

Generally, the facts in *Peck* and *Bergman* are identical excepting, of course, the individual assaults complained of and the resulting injuries. Furthermore, it would appear from reading Judge Stewart's opinion that the theories which *Peck* proceeded on in the Southern District of New York are identical to the theories *Bergmans* proceed on in the Western District of Michigan. There exist, however, at least two significant differences, (and some uncertainty on my part) which are noteworthy.

The differences include: (1) Judge Stewart was confronted with a motion limited to the pleadings under FRCP 12, while the instant motion is being considered, by me, pursuant to Rule 56 (see footnote 2); and, (2) Gary Thomas Rowe's testimony is before me, via deposition taken in 1980, which testimony is critical. Inasmuch as Judge Stewart's opinion was released in 1979, he could not have considered the Rowe testimony.

My uncertainty includes my ignorance of his reasoning on plaintiff's request for declaratory relief, and what "limited discovery" was intended to, and did, accomplish. I assume, without knowing, that Rule 12 discovery must be related, *solely,* to the statute of limitations questions presented by defendants. I am also not privy to the actual pleadings in *Peck.*

### The Bergman Case
### I. The Civil Rights Act

#### A. The 1983 Claim

Plaintiffs allege that Rowe, working as an FBI operative, and in his undercover capacity as a member of the Ku Klux Klan, participated in and furthered the alleged conspiracy between the Birmingham and Anniston police forces and organized vigilantes to deprive them and other "Freedom Riders" of their rights, privileges and immunities as secured by the Constitution and laws of the United States, under color of state law and in violation of 42 U.S.C. §§ 1983, 1985(3) and 1986. It is further alleged that Defendants Jenkins, Kemp and four unknown agents of the FBI approved the acts of Rowe and likewise participated in and furthered the conspiracy in violation of §§ 1983 and 1985(3) by actively concealing this conspiracy, and breaching § 1986 by failing to prevent or aid in the prevention of the physical attack upon Walter Bergman, which was within the knowledge of these Defendants and was purportedly committed in furtherance of the conspiracy.

The Defendants respond by contending that the instant action should be dismissed for failure to state a claim upon which relief can be granted since the Defendants are acting under color of federal, not state, law; the *sine qua non* of a § 1983 suit

being a deprivation of civil rights via action taken under color of *state* law.

In *Peck,* Judge Stewart determined that plaintiff's claim under § 1983 was insufficiently pleaded to state a cause of action since Peck's complaint was vague, stated "conclusionary" (sic) allegations with regard to the conspiracy, and did not sufficiently plead the federal officers' joint participation in any state conspiracy.

Like Judge Peck, I, also, have some difficulty in concluding that Plaintiffs ought to survive a Rule 56 motion on their § 1983 claim, but acknowledge that the record in the case *sub judice* appears to be distinguishable from the *Peck* record, and, consequently, I am inclined to balance the unanswered questions, and the record differences, in favor of the *Bergman* Plaintiffs. There may be no distinction between *Bergman* and *Peck,* but based upon the file, to date, in the instant matter, I cannot, and will not, make such a final conclusion. What follows further supports my inclination:

In *Adickes v. S.H. Kress & Company,* 398 U.S. 144, 150–152, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142, 150 (1970), the Supreme Court held that private parties, jointly engaged with state officials in unlawful conduct, are acting under "color of law" for purposes of 42 U.S.C. § 1983. In so holding, the court indicated that such joint conduct exists when the private and public parties act with a common understanding or "meeting of the minds". *Id.* at 152, 158, 90 S.Ct. at 1605, 1608. See *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267, 272 (1966); *Smith v. Brookshire Brothers, Inc.,* 519 F.2d 93, 94–95 (CA 5 1975) *cert. den.,* 424 U.S. 915, 96 S.Ct. 1115, 47 L.Ed.2d 320 (1976); *Barnes v. Dorsey,* 480 F.2d 1057, 1061 (CA 8 1973); *Fulton v. Emerson Electric Company,* 420 F.2d 527, 530 (CA 5 1969), *cert. denied,* 398 U.S. 903, 90 S.Ct. 1689, 26 L.Ed.2d 61 (1970). *See also, Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Lombard v. Louisiana,* 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); *Smith v. Hampton Training School*

*for Nurses,* 360 F.2d 577, 580 (CA 4 1966). In expanding upon this holding, the court in *Kletschka v. Driver,* 411 F.2d 436, 448 (CA 2 1969) reasoned that a joint conspiracy between federal and state officials should carry the same consequences under § 1983 as does joint action by state officials and private persons. In so holding, the *Kletschka* court announced the following test:

> It was the evident purpose of § 1983 to provide a remedy when federal rights have been violated through the use or misuse of a power derived from a State. *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, [482] 5 L.Ed.2d 492 (1961). When the violation is the joint product of the exercise of a State power and of a non-State power then the test under the Fourteenth Amendment and § 1983 is whether the state or its officials played a 'significant' role in the result. See *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, [860] 6 L.Ed.2d 45 (1961). 411 F.2d at 448–449.

See also, *Lyons v. Weinberger,* 376 F.Supp. 248, 254–255 (S.D.N.Y.1974) and *Andujar v. Weinberger,* 69 F.R.D. 690, 695 (S.D.N.Y. 1976).

Hence, sufficient state action appearing to satisfy this test is alleged by the Plaintiffs in the conspiracy to attack the "Freedom Riders." That conspiracy purportedly existed between organized vigilantes in Alabama, local officials and law enforcement officers in Birmingham and Anniston, and Rowe, who allegedly was at the time, both a member of the Ku Klux Klan and a paid informer for the FBI. Rowe, according to the Amended Complaint and his testimony before the Senate Select Committee, was, during this period, acting as an agent of the FBI, operating under broad parameters of authority established by the Bureau. Pursuant to this authorization, Rowe, in an effort to gain information regarding the violent activities of the Klan, infiltrated one of the more active sects of the Klan and participated, with the apparent approval and prior knowledge of the FBI, in violent activities, including the instant beatings. Rowe's deposition of 1980,

which was not before Judge Stewart, is critical to Plaintiffs' 1983 claim and allows it to survive at this stage of these proceedings:

Q. Now, I believe that—strike that. Prior to the actual incident at the bus station, did you expect that the Klan would be permitted to beat the Freedom Riders?

A. Absolutely not.

Q. And why was that?

A. I felt that the department would not allow that to happen. *In fact, I was assured of that.* (emphasis supplied)

Q. When you say the department, who do you mean?

A. The Department of Justice, the FBI.

Q. And you were assured of that prior to the incident itself?

A. Absolutely.

Q. And who assured you?

A. I believe it was Agent McFall was the agent that actually told me that, but I'm not going to swear to it. I don't recall, but I believe Agent McFall was the one that told me, 'Never would we allow this to happen.' Some agent told me that, I can assure you of that.

Q. An FBI agent?

A. That's correct.

Q. And based on that assurance it was your understanding that the FBI was going to stop this from happening in some way?

A. That's correct.

Q. Did you have any further discussions as to the details as to how the FBI was going to stop it?

A. In the discussion the fact had the whole—I believe they told me the whole 101st Airborne out there. Hell, you know, we just—nothing like that could be allowed to happen, that's what I was told.

Q. Okay, and it was based on those assurances that you continued your activity?

A. That's correct. (Rowe Deposition, November 25, 1980, pp. 97–99).

This agency relationship, for purposes of this motion, inextricably intertwines the Defendants into the bowels of the alleged conspiracy. Judge Stewart could not have foreseen that this relationship existed, in the manner claimed by Rowe, since he was not privy to it. He may, or may not, have attempted, by his discovery order, to learn the full extent of Rowe's relationship with the FBI, but I do not know the nature of the discovery order. What is clear by his opinion is that he found, from the pleadings, no allegation, definitively stated, that a federal-state conspiracy existed. The *Bergman* record, however, contains evidence sufficient to raise a question of fact regarding the involvement of the Defendants in an alleged conspiracy and, consequently, Plaintiffs' § 1983 claim is preserved for trial.

### B. The § 1985(3) Claim

Plaintiffs, however, not only allege a violation of § 1983, but also claim a violation of § 1985(3), which Defendants assert cannot be maintained, since § 1985 is only applicable to persons acting under color of state law, and the Amended Complaint herein is directed against federal officials acting pursuant to federal law.

Section 1985(3) was originally enacted by Congress as part of the Ku Klux Klan Act, in order to enforce the Civil War amendments to the Constitution, and to provide a means of redress for persons victimized by the Klan's acts of terror and intimidation. The statute imposes civil liability on persons conspiring to deprive another person or class of persons of: "(T)he equal protection of the laws, or the equal privileges and immunities under the laws". Following its enactment, § 1985(3) remained dormant as a remedy due to narrow judicial construction. See for example, *Collins v. Hardyman,* 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951). This trend was reversed in 1971, when the Supreme Court decided to "accord to the words of the statute their apparent meaning" and held § 1985(3) provided a civil remedy for damages against wholly private infringements of constitutionally protected rights. *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In *Griffin,* a group of

white residents of DeKalb, Mississippi, conspired, planned and agreed to stop the passage of R.G. Grady's automobile, believing mistakenly that he was a worker for Civil Rights For Negroes. This band of vigilantes did stop Grady's car, which was traveling along a state highway, and assaulted the three black male occupants. The victims brought an action under § 1985(3) to redress violations of the laws of the United States and of Mississippi, including the rights of free speech, assembly, association, interstate travel, liberty, and security of their persons. The Supreme Court held that the text of the statute, recent judicial interpretations given to related civil rights provisions, the complementary relationship of the various civil rights statutes, and the legislative history surrounding § 1985(3) all "point [overwhelmingly] to § 1985(3)'s coverage of private conspiracies." 403 U.S. at 101, 91 S.Ct. at 1798.

While eliminating the state action requirement, the *Griffin* court was concerned that the statute, if applied too broadly, would displace many areas of tort law that have traditionally been reserved to the states and thereby violate constitutionally based principles of federalism. "That the statute was meant to reach private activity does not . . . mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others". 403 U.S. at 101, 91 S.Ct. at 1798. Hence, the *Griffin* court read § 1985(3) to apply only to actions which are inspired by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus". 403 U.S. at 102, 91 S.Ct. at 1798. The court then delineated four elements necessary for a litigant to establish a § 1985(3) cause of action:

(1) the defendants must conspire or go in disguise on the highway or premises of another;

(2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and

(3) one or more of the conspirators must commit some act in furtherance of the conspiracy; whereby

(4) another is either (a) injured in his person or property or (b) deprived of having and exercising any right or privilege of a citizen of the United States. *Id.* at 102–103, 91 S.Ct. at 1798.

Having concluded that the plaintiffs had stated a cause of action under § 1985(3), the *Griffin* court then sought to locate a source of congressional power to reach the private conspiracy alleged. The sources identified in *Griffin* were the Thirteenth Amendment and the constitutional right to travel. 403 U.S. at 104–106, 91 S.Ct. at 1799–1800. In so doing, the court observed that other provisions of the Constitution, including Section 5 of the Fourteenth Amendment, might empower Congress to reach other conspiracies by private persons. *Id.* at 107, 91 S.Ct. at 1801. In the case before it though, the *Griffin* court found it unnecessary to look beyond the Thirteenth Amendment and the right to interstate travel.

*Griffin* was applied by Judge Stewart in *Peck, supra*, where it was held that § 1985(3) applied to federal officers acting under color of federal law, at least where the conspiracy was motivated by racial animus and was intended to deprive a class of persons of their rights to interstate travel. See also, *Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926, 931 (CA 10 1975) *cert. den., sub nom. Shoshone and Arapahoe Tribes v. Dry Creek Lodge, Inc.,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981), *reh. den.,* 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981); *Alvarez v. Wilson,* 431 F.Supp. 136 (ND Ill. 1977), and; *Stith v. Barnwell,* 447 F.Supp. 970 (MD NC 1978). Even though the *Peck* court recognized this cause of action, it nonetheless found the allegations contained within the plaintiff's complaint insufficient to allege a justiciable conspiracy under the four-prong test of *Griffin:*

Plaintiff alleges that informant Rowe was a conspirator, and that the individual defendants 'approved the acts of Rowe and likewise participated and furthered the aforesaid conspiracy.' (Complaint

¶¶ 23–24.) This unsubstantiated allegation is not enough. See *Robinson v. McCorkle,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972). Plaintiff's only other basis for a charge of conspiracy in this case is that the defendants knew of the planned attack and failed to do anything to stop it. (Complaint ¶¶ 10–13.) Mere knowledge, however, is insufficient to sustain a claim of conspiracy under § 1985(3). *Byrd v. Local Union No. 24, Int. Bro. of Electrical Workers,* 375 F.Supp. 545, 558 (D.Md.1974). *Id.* at 1012.

Since it is incumbent upon me, in the instant case, to look to the entire record, doubts which I harbor regarding Plaintiffs' 1985(3) claim must be resolved in favor of the Plaintiffs because discovery, to date, presents a fact question for resolution. This is especially so since the facts as developed embody all four elements essential to a successful § 1985(3) claim under *Griffin.* First, the record is arguably sufficient to establish a conspiracy among members of the KKK, local and state officials and law enforcement officers, and the individual Defendants. Secondly, it is apparent that this conspiracy was inspired by a racially discriminatory animus for the purpose of depriving Plaintiffs and their fellow "Freedom Riders" of the equal protection of the laws and of their right to interstate travel. Thirdly, proof that the Plaintiffs were assaulted, beaten and threatened establishes the requisite "act in furtherance" of the conspiracy. Finally, there is evidence of personal injury, economic loss, and a deprivation of rights and privileges accorded to a citizen of the United States. Having met the *Griffin* test, Plaintiffs' § 1985(3) claims should be resolved at trial.

#### C. The § 1986 Claim

In addition to this § 1985(3) claim, Plaintiffs assert that Defendants have violated 42 U.S.C. § 1986. That action applies when a person, including a federal officer acting under color of federal law, has knowledge that an act mentioned in § 1985 is about to be done, has the power to prevent the same, and fails to act. It can only be pleaded once a Plaintiff has sufficiently alleged a § 1985(3) violation. *Hahn v. Sargent,* 523 F.2d 461, 470 (CA 1 1975), *cert. den.,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The Defendants contend, in summary fashion, that this cause of action ought to be dismissed.

In reviewing this claim I am of the opinion, as was Judge Stewart, that this cause of action is clearly justiciable. (However, see discussion of statute of limitations, *infra.*) Having determined that a § 1985(3) cause of action has been sufficiently alleged for the purposes of the instant motion, the remaining elements of a viable § 1986 action (namely, that the Defendants had actual knowledge of the conspiracy and that they had the power to prevent or aid in preventing the commission of the attack), find support in the pleadings and the record. *See, Peck, supra.* Defendants' motion, consequently, ought to be denied on the § 1986 claim.

#### II. *The Bivens Claim*

In addition to Plaintiffs' cause of action asserted under The Civil Rights Act, a further claim has been alleged against the individual Defendants pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, supra.* In *Peck,* Judge Stewart opined that, inasmuch as complete relief can be obtained by Peck under 42 U.S.C. § 1986 ... "there is no need to imply a cause of action based upon the denial of plaintiff's constitutional rights..." 470 F.Supp. at 1017. I tend to agree with Judge Stewart's analysis that when there exists an effective and substantial federal statutory remedy to the plaintiffs, which obviates the need to imply a cause of action here, the implication need not be made. However, I decline to dismiss the *Bivens* claim until such time as I am convinced that Plaintiffs § 1986 claim can be maintained (see my discussion on the statute of limitations problem *infra.*)

### III. The Federal Tort Claims Act Claim

Plaintiffs have asserted claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 2674. In the Second Amended Complaint, Plaintiffs allege that the Defendants failed to:

... assure the equal enforcement of the law, despite knowledge that the law would not be enforced. These failures were violations of the Defendants' duties as federal officials required by the Constitution, federal statutes and federal regulations to protect the constitutional rights of United States citizens, including those engaged in interstate travel.

19. The willful failure of Defendants, JENKINS, HELD, KEMP, Defendants A through D, and Defendant KELLEY (and his predecessor HOOVER) to deter or to report the existence of the conspiracy and planned violence to persons in the Department of Justice other than FBI personnel, was a wrongful omission in derogation of their duty as federal law enforcement officers to prevent crime and to protect United States citizens from known attempts to deprive them of their civil rights, in violation of Plaintiffs' rights under the First, Fourth, Ninth, Thirteenth and Fourteenth Amendments to the Constitution.

In addition, the Plaintiffs further allege in Count II that the Defendants failed to:

... inform local and state officials of the planned violence. Furthermore, the Defendants failed to assure the equal enforcement of the law, despite knowledge that the law would not be enforced. These failures were violations of the Defendants' duties as federal officials required by the Constitution, federal statutes and federal regulations to protect the constitutional rights of U.S. citizens, including those engaged in interstate travel.

30. The willful failure of Defendants JENKINS, HELD, KEMP, and the De-
fendants A through D, and Defendant KELLEY (and his predecessor HOOVER), to deter or to report the existence of the conspiracy and planned violence to persons in the Department of Justice other than FBI personnel, was a wrongful omission in derogation of their duty as federal law enforcement officers to prevent crime and to protect U.S. Citizens from known attempts to deprive them of their civil rights, in violation of Plaintiffs' rights under the First, Fourth, Fifth, Ninth, Thirteenth and Fourteenth Amendments to the Constitution.

31. Defendant KELLEY and his predecessor HOOVER knew of and actively concealed this wrongful omission.

The Federal Tort Claims Act authorizes suit against the United States since the Act constitutes a waiver by the United States of its immunity from liability and tort for the acts of its employees and representatives. *Reminga v. United States,* 631 F.2d 449 (CA 6 1980). Indeed, this Act makes the United States liable, with certain exceptions (28 U.S.C. § 2680) for the negligence of its employees "in the same manner and to the same extent as a private individual under like circumstances..." 28 U.S.C. § 2674. *Neal v. Bergland,* 646 F.2d 1178 (CA 6 1981).

Contrary to the allegations contained in the Second Amended Complaint, the Defendants assert that no statutory or regulatory duty is imposed upon the FBI to protect individuals since: "Nowhere in those sections is there a suggestion that the FBI is a peace-keeping force at all, let alone that it has *duties* to individuals." (Emphasis in original, Defendants' June 2, 1977 brief.) The specific sections cited include 28 U.S.C. § 531 *et seq.,* which provides for the establishment of the FBI; 18 U.S.C. § 3052, which grants additional powers to FBI agents than those enumerated in § 531 *et seq.;*[3] and 28 CFR § 0.85, which, for

---

**3.** 18 U.S.C. § 3052 states:

The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may
carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony

example, provides that the Director of the FBI shall investigate violations of the laws of the United States and collect evidence in cases in which the United States is or may be a party in interest.

Judge Stewart held that the plaintiff could not proceed under a *respondeat superior* theory, but could go forward on a negligence *per se* theory, provided that a duty to warn was found under Alabama law, or if the federal government voluntarily undertook some affirmative action by which it assumed the duty to warn victims of criminal activity. *Peck* could find no state law duty to warn, and further noted that the plaintiff did not even allege that the federal government voluntarily undertook some affirmative action to assume some duty to warn.

 Judge Stewart did not analyze the federal statutes or regulations but, instead, turned to an examination of state common law. While I agree that Alabama law does not recognize a common law duty to warn or protect I cannot, on that basis, alone, dismiss the tort claim out of hand.

From all the statutory and regulatory sections cited to me, 28 U.S.C. § 533 is particularly compelling, in that it provides, in pertinent part, that FBI officials are appointed: " ... to detect and prosecute crimes against the United States."

 While this statute confers investigative powers upon an FBI official, it also confers a prosecutorial duty to follow up any investigation undertaken. The Second Circuit in *Weinberg v. United States,* 126 F.2d 1004 (CA 2 1942), commented on the statutory authority:

> Aside from the work of the criminal identification division, the Federal Bureau of Investigation is by statute only an organization of "officials who shall be vested with the authority necessary" "for the detection and prosecution of crimes against the United States." 5 USCA § 300. And United States Attorneys are charged with the duty of prosecuting all

cognizable under the laws of the United States if they have reasonable grounds to

"delinquents for crimes" within their respective districts. 28 USCA § 485. They are "vested with complete control over the proceedings, in the exercise of sound discretion." *Deutsch v. Aderhold,* 5 Cir., 80 F.2d 677, 678. Clearly, special agents generally operate to aid the United States Attorneys. *Cooper v. O'Connor,* 69 App.D.C. 100, 99 F.2d 135, 139, 118 A.L.R. 1440, *certiorari denied* 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414, *rehearing denied* 305 U.S. 673, 59 S.Ct. 242, 83 L.Ed. 436; 307 U.S. 651, 59 S.Ct. 1035, 83 L.Ed. 1529, 1530; *cf.* 5 USCA § 300a. 126 F.2d at 1008.

 However, this prosecutorial function is not merely limited to aiding United States Attorneys. *Black's Law Dictionary,* 5th Edition defines the term "prosecute" in part as follows: "to carry on an action or other judicial proceeding; to proceed against a person criminally..." (p. 1099), thus implying that once Bureau officials have concluded their investigation, they will take whatever steps are necessary to bring criminal charges against the suspect criminals; i.e. the definition and by its terms, the statute, clearly imply that some affirmative action on the part of an official *will be effectuated.*

Taking into consideration the present factual context of this case, in a light most favorable to the Plaintiffs, it is apparent that Defendants, prior to the assaults in Anniston and Birmingham, had detected violations of 18 U.S.C. § 371 (Conspiracy to commit any offense against the United States); 18 U.S.C. § 241 (Conspiracy to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege conferred on him by the Constitution or law of the United States); and, 18 U.S.C. § 2101 (Organization, promotion, participation in or carrying on a riot), and yet, despite this knowledge, did not affirmatively act to enforce the laws of the United States; i.e. the Defendants merely detected these crimes but did not attempt to "prosecute" them, even

believe that the person to be arrested has committed or is committing such felony.

though they had a statutory duty to do so. If the Defendants had acted in accordance with this statutory mandate, then conceivably the injury which befell the Plaintiffs might have been prevented.

Indeed, "it cannot be denied that the government has a duty to maintain law and order ...", *Redmond v. United States,* 518 F.2d 811, 816–817 (CA 7 1975) and to desist from condoning and assisting criminal activity. Here, if the allegations of Plaintiffs' Complaint are sustained, the government not only failed to prosecute the criminals when it had the opportunity, but aided and furthered the criminal enterprise.

■ However, federally imposed obligations are not the source of the private right of action under the FTCA. In *Schindler v. United States,* 661 F.2d 552 (CA 6 1981) the Sixth Circuit recognized that state law is the source of the cause of action brought under the Federal Tort Claims Act. In doing so, the *Schindler* Court held nonetheless, that a federal statute or regulation may well be relevant to the analysis of the state cause of action.

In determining the first element, the existence of a duty from the plaintiff to the defendant, the federal regulatory statute may be relevant in defining the scope of the undertaking of the United States and the plaintiff's right to rely thereon, if the action is based on an alleged failure of the United States to observe its own regulations. The federal regulation or statute may also be relevant in assessing the second element of the cause of action, if, under state law criteria, it may be considered the kind of statute or regulation violation of which is negligence *per se. Id.* at 560–561. (Footnotes omitted.)

Since the Court must look to the law of the state where the tort occurred, Alabama law is applicable. *Peck, supra.* Alabama case law provides the elements of the cause of action for tortious injury as follows:

In every action grounded upon negligence there are three essential elements to a right of recovery. First, a duty owed by the defendant to the plaintiff; second, a breach of that duty; and third, an injury to plaintiff in consequence of that breach. *Elba Wood Products, Inc. v. Brackin,* 356 So.2d 119, 122 (Ala.1978).

In addition, the Fifth Circuit applied Alabama law to a cause of action based in tort brought after an airplane crash. In *Ross v. United States,* 640 F.2d 511 (CA 5 1981), the administratrix of the estate of the deceased airplane pilot and pilot's son, a passenger in the plane, brought an action against the United States, alleging that the crash occurred as the result of negligence on the part of an air traffic controller in supplying the pilot with an incorrect "Minimum Descent Altitude". In analyzing the aforestated elements of a negligence cause of action, the court concluded that a duty had been assumed on the part of the controller, who had taken action beyond that called for in the controller's "Procedures Manual". In finding a duty, the *Ross* Court commented:

Significantly, " '[i]t is now well established that when the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently.' " *Hartz v. United States,* 387 F.2d 870, 874 (5th Cir. 1968), *quoting Ingham v. Eastern Airlines, Inc.,* 373 F.2d 227, 236 (2nd Cir. 1967). *Id.* at 519.

In this case, unlike *Ross,* a statute sets forth a duty and responsibility to detect and prosecute crimes against the United States, hence, a more compelling situation is found in the instant case, where the Plaintiffs can point to specific legislation. *See also, Empresa de Viacao Area Rio Grandense (Varig Airlines) v. United States,* 692 F.2d 1205, (CA 9 1982); 51 LW 2247, 10–26–82.

■ Indeed, the law of Alabama recognizes the principles summarized in §§ 323 and 324A [4] of the Restatement of Torts, 2d.

---

4. These sections read:

§ 323. *Negligent Performance of Undertaking to Render Services.* One who under-

takes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of

*See for example, Dailey v. City of Birmingham,* 378 So.2d 728 (Ala.1979); *Robinson v. Harris,* 370 So.2d 961 (Ala.1979); *United States Fidelity and Guarantee Company v. Jones,* 356 So.2d 596 (Ala.1978); *Beasley v. MacDonald Engineering Company,* 287 Ala. 189, 249 So.2d 844 (1971); *City of Prichard v. Kelley,* 386 So.2d 403 (Ala.1980). Each of these sections has applicability to the instant case. Thus, in determining whether a duty exists, the Court has looked to the terms of 28 U.S.C. § 533 and the actual conduct of the United States. In so doing, it is possible that services to these Plaintiffs, such as would be the basis of liability of a private person under like circumstances, have been rendered gratuitously or for consideration by the United States. The FBI has undertaken to "detect and prosecute crimes against the United States" and the public of this country has a right to rely upon the careful operation of such services.[5]

*See also, Swanner v. United States,*[6] 275 F.Supp. 1007 (MD Ala.1967), *rev. on other grounds,* 406 F.2d 716 (CA 5 1969), *on remand,* 309 F.Supp. 1183 (ND Ala.1970). Consequently, it is possible that Plaintiffs may be able to demonstrate an actionable duty on the part of the United States at the trial of this matter. The federal government may, or may not, have deviated from the duty it effectively undertook and, may or may not have proximately caused Plaintiffs' injuries. The resolution of that duty, if any, and a violation of it, if any, must await trial.[7] Plaintiffs have the right to pursue their Federal Tort Claims cause of action.

## IV. *Statute of Limitations Issues*

Defendants assert that Plaintiffs' claims under FTCA, §§ 1983, 1985(3), and 1986 are barred by applicable statutes of limitations.

the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

§ 324A. *Liability to Third Person for Negligent Performance of Undertaking.* One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

5. Plaintiffs have alleged that a duty is inherent under the circumstances of this case because of the "special relationship" that exists between the parties. At this time, the Court cannot say whether such a relationship exists or not and, accordingly, the Plaintiffs are left to their proofs at trial.

6. The *Swanner* Court held that under the law of Alabama the United States had a common law duty to protect the victim of a crime when it had prior knowledge of the crime. There, however, a special relationship was determinative of the duty owed by the government where

the United States failed to protect an informant. As already noted, it is not possible at this time to determine whether such a relationship exists in the case at bar.

7. In addition, a duty to these Plaintiffs or a duty to report the alleged conspiracy to the United States Attorney General or others may have been imposed upon the Defendants by virtue of internal FBI regulations, which counsel for the Plaintiffs should be able to discover. *See for example, Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1953); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963). Support for the foregoing is found in the deposition of John Doar, First Assistant to the Assistant Attorney General in charge of the Civil Rights Division where it is stated that it was the perception of the United States that any obligation it had in a situation of this kind arose only after there was an obstruction to interstate commerce, not before it. (Doar Dep. 134–135.) Even then, it is stated that such an obligation was limited to taking action to require state and local authorities to perform their duty. (Doar Dep. 134–136.) This attempt though to disclaim responsibility totally ignores the alleged culpability of the FBI in initiating this criminal enterprise and, therefore, cannot be deemed credible. It moreover, reflects an attitude of omission and possibly disregard of the duty imposed by virtue of 28 U.S.C. § 533.

Judge Stewart did not reach this issue with regard to Plaintiffs' 1983 and 1985(3) claims inasmuch as he dismissed those claims on other grounds. He did, however, address the issue with regard to Peck's Federal Tort Claims Act and his § 1986 claim; and in so doing identified the critical issue underscoring defendants' limitations defense; i.e. .. "(t)he problem in this case lies in determining when the cause of action 'accrued'". 470 F.Supp. at 1018.

### A. The Federal Tort Claim

In *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) the Supreme Court discussed at length the issue of when a cause of action accrues in the context of a federal tort claim. There, a medical malpractice plaintiff brought suit within two years of the date on which he learned that the treatment which caused his injury may have constituted malpractice, but more than two years after the date on which he had knowledge of both his injury and its cause. The court was faced with the question of whether the plaintiff's cause of action accrued on the earlier date, when he had knowledge of his injury and its cause, or whether it accrued only on his awareness that he may have been legally wronged.

In concluding that the Plaintiff's cause of action accrued on the earlier date, the court distinguished between knowledge of injury and causation and knowledge of a legal wrong:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. *Id.* at 122, 100 S.Ct. at 359.

The Court emphasized that the purpose of § 2401(b) is to require the reasonably diligent presentation of claims, and stated that the postponement of accrual until a plaintiff is aware that his injury was negligently afflicted would undermine that purpose. Thus, in the area of medical malpractice, a plaintiff's cause of action accrues within the meaning of § 2401(b) on his knowledge of his injury and the relevant facts about causation.

*Kubrick* was discussed by Judge Joiner, in *Liuzzo v. United States,* 485 F.Supp. 1274 (ED Mich.1980), who concluded, after an erudite analysis, that the Supreme Court in *Kubrick* signaled an end to a categorical approach to the analysis of statute of limitations issues and informed, henceforth, that the facts of each cause must be thoroughly examined to determine when a plaintiff had knowledge of the "critical facts" regarding his injury. Judge Joiner explained: "(O)n this date, his claim accrues, and the plaintiff is charged with the duty of promptly investigating and presenting his claim." *Id.* at 1281. In so stating, the *Liuzzo* court concluded that the rationale of *Kubrick* compelled its application to those non-malpractice cases where the plaintiff is ignorant of the critical facts concerning his injury. I, upon reflection, am also of the opinion that *Kubrick* has application to non-malpractice cases and especially to this case. However, the court in *Kubrick* was not directly faced with the question presented here of whether a plaintiff's ignorance of the identity of the person who caused the injury postpones the accrual of his cause of action. This apparent omission, though, was discussed in *Liuzzo* by Judge Joiner who wrote:

> ... the language and rationale of *Kubrick* indicate that ignorance of the 'who' element of causation should, like ignorance of the 'what' element of causation, postpone accrual of a cause of action, at least in certain circumstances.

As noted above, *Kubrick* drew a distinction between a plaintiff's ignorance of a legal wrong and ignorance of his injury and its cause. In so doing, the Court identified the 'critical facts' that give rise to the accrual of a cause of action: that the plaintiff has been injured and who inflicted the injury. *Kubrick, supra* at 221, 100 S.Ct. at 359. The rationale underlying the postponement of accrual until the plaintiff learns of both his injury and its cause rests on the Court's recognition that an injury may itself be latent, and facts about causation may be in the control of the putative defendant, 'unavailable to the plaintiff or at least very difficult to obtain.' Once armed with the knowledge of his injury and its cause, however, a plaintiff is able to investigate whether he has suffered an actionable injury. *Id.*

The *Kubrick* decision thus reflects a pragmatic reconciliation between two competing concerns. The first concern is to preserve the purpose of § 2401(b), that of requiring the reasonably diligent presentation of claims against the government. The second concern, as the language in *Kubrick* makes clear, is that of fixing the date of accrual of a claim at that point in time when the plaintiff can realistically be expected to undertake an investigation into the possibility of pressing a claim against the government. In *Kubrick*, the Court found that a malpractice plaintiff is able to conduct such an investigation when he acquires knowledge of his injury and its cause, and that postponement of accrual beyond this time would undermine the purpose of the limitations statute.

Based on the above, *it is clear that a plaintiff's ignorance of the identity of the tortfeasor can be as critical an element to accrual as ignorance of what the tortfeasor did to cause the injury. Without knowledge of the identity of the tortfeasor, an injured party may be helpless to discover the relevant information about his injury, including whether the tortfeasor's conduct conformed to the standards required by law. Thus, the inquiries which Kubrick requires an injured party to make upon accrual of his claim may be foreclosed when he is ignorant of the identity of the persons responsible for his harm.* Nonetheless, *Kubrick* clearly instructs that reasonable diligence is required in presenting claims against the government, and accrual of a cause of action cannot be postponed beyond the date on which the injured party has sufficient information to conduct an investigation into the merits of his claims. *Id.* at 1281–1282. (Emphasis supplied)

In *Liuzzo*, the children of civil rights worker Viola Liuzzo filed an administrative action in 1976 under the Federal Tort Claims Act, alleging that the government was responsible for the murder of their mother in Montgomery, Alabama in March of 1965. The United States asserted the two year limitations defense under § 2401(b) arguing that the plaintiff children knew all relevant factors in 1965 when their mother was killed by shots fired from a car bearing three Klansmen and FBI informant Gary Thomas Rowe, Jr. At the time of the murder, plaintiffs were aware of their injury and its direct cause. However, even though plaintiffs believed they knew "who" caused their injury as soon as they knew "what" caused their injury, certain facts which bore upon the "*who*" issue were not revealed until ten years later when Rowe testified before the Senate Committee.

Under the circumstances of this case, it would be both unfair and unrealistic to hold that plaintiffs should have investigated their claims earlier, for they had no cause to do so. This case thus presents an instance in which knowledge of the identity of the tortfeasor is a critical element to the accrual of a claim. Until 1975, plaintiffs had no knowledge sufficient to put them on notice that the defendant or its agents may have caused their mother's death. Rowe's 1975 testimony provided the first direct information of possible governmental malfeasance, and plaintiff's claims accrued no later, and no earlier, than this date.

From December 2, 1975, plaintiffs had two years to determine whether they would file a claim against the government. This they did, and *Kubrick* requires no more. *Id.* at 1283.

Likewise, in the case *sub judice,* it would be both unfair and unrealistic to hold that Plaintiffs should have investigated their claims earlier—for they had no cause to do so. This case, similar to *Liuzzo,* presents an instance in which knowledge of the identity of the tortfeasor or tortfeasors is a critical element to the accrual of a claim.

Here, the *earliest possible date* on which Plaintiffs had sufficient information to commence an investigation into whether they had a cause of action against these Defendants was in December of 1975 when they learned, through sundry news reports of the testimony of Rowe before the Senate Select Committee on Intelligence Practices. Whether this knowledge was conclusively sufficient, at that time, to apprise Plaintiffs of sufficient information to commence an investigation is however, uncertain, as it is possible that this notice alone could not allow Plaintiffs, in the exercise of due diligence, to discover the government's allegedly wrongful acts. Indeed, as noted by Judge Stewart in *Peck:*

> Nor should the news articles have put plaintiff on inquiry to investigate the trial transcripts. There was nothing in the news reports to suggest that Rowe was anything more than an observer at the Birmingham incident. Certainly there was nothing there to suggest that the trial transcripts might indicate that the FBI, through Rowe, had prior notice of the planned attack. Furthermore, even if plaintiff was on general notice as to the trial transcripts plaintiff could not reasonably have been on notice as to the contents of the specific transcripts relied upon by defendants. 470 F.Supp. at 1020.

I cannot tell, from reading *Peck,* when Peck filed his complaint; nor do I know when he "discovered" sufficient facts to ascertain the "who" issue discussed in *Liuzzo.* I do know, however, when the Bergmans filed their complaint but, based upon

what has, to date, been presented to this Court, I am unclear as to when these Plaintiffs were sufficiently apprised of the "who" issue. I cannot, therefore, ascertain when Plaintiffs' claims accrued. At a minimum, I am of the opinion that they may have accrued in December of 1975; but it is just as possible that they accrued somewhat later. In any event, it is clear that the *earliest* possible date in which Plaintiffs could have been put on notice of the "who" aspect was in December of 1975.

█ Since 28 U.S.C. § 2401(b) provides that a tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues, or unless action is begun within six months after the date of mailing, Plaintiffs, by virtue of filing the instant action in January of 1977, are within the relevant time limitations set forth by the FTCA. Accordingly, § 2401(b) as interpreted by *Kubrick,* and *Liuzzo,* does not bar Plaintiffs' federal tort claims.

### B. The Civil Rights Act Claims

█ Of all the claims asserted by the Plaintiffs, under the Civil Rights Act only the 42 U.S.C. § 1986 claim is circumscribed by a statute of limitations. Since the remaining claims do not contain any inherent limitation period, the Court must look to the applicable statute of the forum state to determine whether Plaintiffs' claims are time barred. *Crawford v. Zeitler,* 326 F.2d 119 (CA 6 1964); *Krum v. Sheppard,* 255 F.Supp. 994 (WD Mich.1966), *aff'd* 407 F.2d 490 (CA 6 1967). *Kilgore v. City of Mansfield, Ohio,* 679 F.2d 632 (CA 6 1982). Accordingly, I am bound to apply Michigan law to the instant query. Because Plaintiffs' claims accrued outside of Michigan, reference must be made to the Uniform Statute of Limitations and Forum Claims Act, M.C.L.A. § 600.5861; M.S.A. § 27A.-5861, as amended, also known as the "borrowing statute", where it is provided:

> An action based upon a cause of action accruing without this state shall not be commenced after the expiration of the

statute of limitations of either this state or the place without this state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of this state the statute of limitations of this state shall apply. This amendatory act shall be effective as to all actions hereinafter commenced and all actions heretofore commenced now pending in the trial or appellate courts.

Since the Plaintiffs in this case are residents of Michigan, the statute of limitations of this state must be applied. *See, Smith v. Elliard,* 110 Mich.App. 25, 312 N.W.2d 161 (1981).

Two possible state limitations are applicable to the instant factual situation; the general Michigan three year period for injuries to persons contained in M.C.L.A. § 600.5805(8); M.S.A. § 27A.5805(8), *Krum v. Sheppard, supra;* or the two year period for actions charging assault and battery as set forth in M.C.L.A. § 600.5805(2); M.S.A. § 27A.5805(2). See for example *Mulligan v. Schlachter,* 389 F.2d 231 (CA 6 1968) and *Carmicle v. Weddle,* 555 F.2d 554 (CA 6 1977).

■ Regardless of which of these limitations periods should apply as the most clearly analogous period under Michigan law, Plaintiffs' claims under §§ 1983 and 1985(3) are not time barred since they were filed within two years of the accrual of their cause of action (see discussion of accrual time *supra* ).

A far more difficult question is presented by virtue of Defendants' limitation arguments submitted in defense of Plaintiffs' § 1986 cause of action. By its terms an action brought pursuant to § 1986 is limited by a one year period, which runs from the accrual date of the cause of action. Consequently, if Plaintiffs' § 1986 claim accrued, in fact, in December 1975, it would be time barred since the complaint in this matter was not filed until January of 1977. However, as I have opined *supra,* I cannot find, on the basis of the current record, conclusively when Plaintiffs' claims in fact accrued (did they accrue in December of 1975, or earlier, or later?). Until such time as

additional evidence is presented, I am constrained to withhold any ruling on Plaintiffs' § 1986 claim and they may proceed with it until and unless additional evidence is offered to this Court, which is persuasive.

Another argument favoring my deferring judgment as to the justiciability of Plaintiffs' § 1986 claim is presented by virtue of Plaintiffs' waiver argument. Court records disclose that Defendants did not raise the instant limitations defense in their first Motion to Dismiss, filed on March 25, 1977, but instead waited for three years, until March 25, 1980, to plead the one year limitation defense in a Supplemental Motion to Dismiss. It appears to me that there is some merit to Plaintiffs' argument, but as with the accrual problem, I lack certain fundamental information.

■ The statute of limitations is an affirmative defense which, under Rule 8(c) of the Federal Rules of Civil Procedure, must be set forth affirmatively in a responsive pleading. Here, as noted, the Defendants have raised the defense in a supplemental Motion to Dismiss, filed three years after the original Motion for dismissal. Rule 15(d) FRCP states:

> Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleadings sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefore.

Leave to file a supplemental motion was not obtained from the Court and an inspection of the supplemental pleading reveals that no subsequent transactions, occurrences or events which transpired since the date of filing of the original Motion to Dismiss, have been set forth. Conceivably then, this supplemental motion is an inappropriate

means by which to assert a statute of limitation defense that could have, and should have, been posed in the Defendants' original Motion to Dismiss.

The procedure which should have been followed is that outlined in Rule 15(a), which concerns the amendment of pleadings. In the case at bar, the Defendants have not sought leave to amend, despite the obvious invitation which the Complaint extended. However, the supplemental pleading might be construed as a request to amend the original Motion to Dismiss. Should that be the case then a court in determining whether or not to allow an amendment to the pleadings pursuant to Rule 15, must consider whether the party seeking leave to amend should have been aware of the possible existence of the defense at an earlier time. *Faith v. Texaco, Inc.,* 48 F.R.D. 118 (WD Mich.1969). In *Faith* the court set forth the rule governing amendments pursuant to Rule 15(a), as follows:

Federal Rule 15(a) requires that leave to amend pleadings be freely granted 'when justice so requires.' However, it is equally true that such leave should be denied '[when] the amendment would cause substantial prejudice to a party to the action.' *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1155 (2d Cir.1968). The Court must carefully balance the effect of permitting an amendment of this type, 'for it is manifest that risk of substantial prejudice increases in proportion to the length of defendant's delay in seeking the amendment.' *Id.* at 120.

Whether substantial prejudice has occurred is debatable and inconclusive at this juncture. I realize that I ought to consider the expenses incurred by the Plaintiffs in their pretrial work, and in preparing for trial. Equal consideration should be given to the fact that Defendants might have to defend a cause of action which, by its express terms, ought to be barred.

In *Basko v. Winthrop Laboratories, Inc.,* 268 F.Supp. 26, 28–29 (DC Conn.1967), the court in finding that the defendant therein had waived the defense of the statute of limitations by not pleading it until ten months after it had filed its answer, stated:

... If counsel believed that any serious question might exist as to possible expiration of the relevant statutory limitation periods, then in fairness to all parties the defense of the statute of limitations should have been explicitly preserved in the answer...

Similarly in *Faith, supra,* Judge Fox (Senior Judge of this District) opined that if Defendants had any question as to whether a statute of limitations defense should have been asserted, an attempt, through discovery, to ascertain what facts were necessary to resolve the issue should have been made:

During this extra time they should have recognized that the statute of limitations was a possible issue, since the complaint itself was somewhat vague as to the onset of the injuries. Discovery was available to the defendants if they required more information in this regard. *Id.* at 121.

Conceivably, a limitation of action claim would seem to have been an obvious defense three years ago. However, I am uncertain as to what prejudice, if any, has resulted to Plaintiffs by virtue of the delay in asserting this defense. Cf. *Basko v. Winthrop Laboratories, Inc., supra.* See also, *Smith v. Insurance Company of North America,* 30 F.R.D. 540 (MD Tenn.1962); *Roe v. Sears, Roebuck & Co.,* 132 F.2d 829 (CA 7 1943); *Hayden v. Ford Motor Company,* 497 F.2d 1292 (CA 6 1974); *McGraw v. Matthaei,* 388 F.Supp. 84 (ED Mich.1972). The instant waiver argument, therefore, is not susceptible of resolution at this time and must await further evidence at trial.

### V. *Personal Jurisdiction*

As contrasted to my reservation on the issue of a waiver of the § 1986 limitations defense, I am clearly persuaded that Defendants' assertion that there is a lack of personal jurisdiction over the individual Defendants, and that venue is improperly laid in this Court has, in fact, been waived. Rule 12 of the Federal Rules of Civil Procedure provides:

(h) *Waiver or Preservation of Certain Defenses.*

(1) A defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.

(2) A defense of failure to state a claim upon which relief can be granted, a defense of failure to join a party indispensable under Rule 19, and an objection of failure to state a legal defense to a claim may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits.

(3) Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.

Since the defenses of lack of personal jurisdiction and improper venue were *not* included in Defendants' first Motion to Dismiss in 1977, they cannot now, three years later, set forth those defenses. "If a party makes a motion under this rule but omits therefrom *any defense or objection then available* to him which this rule permits to be raised by motion, *he shall not thereafter make a motion based upon the defense or objection so omitted. . ."* (Rule 12(g); emphasis supplied). *See Elbinger v. Precision Metal Workers Corporation,* 18 F.R.D. 467 (ED Wis.1956); *Ryan v. Glenn,* 52 F.R.D. 185 (ND Miss.1971); and *Konigsberg v. Shute,* 435 F.2d 551 (CA 3 1970); *Rauch v. Day & Night Manufacturing Company,* 576 F.2d 697 (CA 6 1978). I, therefore, deem these defenses waived by Defendants.

**VI.** *The Issue of Declaratory Relief*

(or the Case or Controversy controversy)

Finally, Defendants contend that, as the acts complained of in Plaintiffs' Amended Complaint occurred 20 years ago, Plaintiffs' demand for declaratory relief must fail, since there is no present case or controversy before the Court, inasmuch as there is no present or immediately threatened injury.

The Constitution limits the exercise of the judicial power to "cases" and "controversies." The Declaratory Judgment Act of 1934 in its limitation to "cases of actual controversy", manifestly has regard to the constitutional provision and is operative only in respect to controversies which are controversies in the constitutional sense. A "controversy" in this sense must be one that is appropriate for judicial determination. It "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Insurance Company v. Haworth,* 300 U.S. 227, 240–241, 57 S.Ct. 461, 463–464, 81 L.Ed. 617 (1937). The controversy must be real and substantial, admitting of specific relief as distinguished from being an advisement as to the law upon a hypothetical state of facts.

In support of their argument, the Defendants reference cases which are all inapposite to the case at bar. (*Roe v. Wade,* 410 U.S. 113, 127–129, 93 S.Ct. 705, 713–715, 35 L.Ed.2d 147 [1973] *reh. den.,* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 [1973]; *Laird v. Tatum,* 408 U.S. 1, 10–11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 [1972] *reh. den.,* 409 U.S. 901, 93 S.Ct. 94, 34 L.Ed.2d 165 [1972]; *Sierra Club v. Lynn,* 502 F.2d 43, 67 [CA 5 1974] *cert. den.,* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 and 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 701 [1975] *reh. den.,* 423 U.S. 884, 96 S.Ct. 158, 46 L.Ed.2d 115 [1975]). In *Roe v. Wade* the Supreme Court found that it had jurisdiction to hear a challenge to laws making abortions illegal, even though at the time the court decided the case, some of the original class action plaintiffs, namely pregnant women desiring abortions at the time the action was commenced, either had their children or an abortion, which would normally render the case moot. This part of the decision was reached because the issue was "capable of repetition, yet evading review." How-

ever, with respect to a couple who claimed that the abortion laws detrimentally affected their marital happiness and based their claim on the possibility that the wife might at some point in time accidentally become pregnant against medical advice, the Court found this alleged injury to be too indirect, speculative and contingent to present a case or controversy. Similarly, in *Laird* and *Sierra Club,* the injuries alleged were equally speculative and therefore beyond the jurisdictional domain of the federal court.

Here, as compared to the as yet inchoate injuries alleged in these cases, Plaintiffs Walter and Frances Bergman have alleged real injuries arising out of the sudden and brutal attack on May 14, 1961. These resultant injuries cannot be termed hypothetical or speculative.

In determining whether or not declaratory relief would be proper in any given situation, the courts have frequently followed the guidelines stated by Professor Borchard:

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations and issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings. It follows that when neither of these results can be accomplished, the Court should decline to render the declaration prayed. E. Borchard, *Declaratory Judgments,* 299 (2d Ed 1941).

*See* for example *Alsager v. District Court of Polk County, Iowa (Juvenile Division),* 518 F.2d 1160 (CA 8 1975). In *Public Service Commission v. Wycoff Company,* 344 U.S. 237, 243–244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952) the Supreme Court discussed the standards to be applied:

> But when all of the axioms have been exhausted and all words of definition have been spent, the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of

federal judicial power. While the courts should not be reluctant or niggardly in granting this relief in the cases for which it was designed, they must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, especially [sic] in the field of public law ... Such differences of opinion or conflicts of interest must be 'ripe for determination' as controversies over legal rights. The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.

The Supreme Court in *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982), further expanded upon the "capable of repetition yet evading review" standard by indicating that it was limited to those situations where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again. *Id.* at 482, 102 S.Ct. at 1183 citing *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), and, *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

Declaratory relief in this case will undoubtedly clarify and settle the legal relations between Defendants and Plaintiffs; i.e., whether Defendants owe a duty to Plaintiffs and, if so, of what nature. It will also ultimately decide this controversy.

However, I am unable to say at this time, and based upon the record as it now stands, that this issue *is* capable of repetition or that the Plaintiffs might be subjected to the same act again. Judge Stewart in *Peck* discussed all claims for declaratory relief via a prior Order and Judgment issued pursuant to a magistrate's report. I do not know why this decision was made, but fail

to see any difference between *Peck* and *Bergmans.* Accordingly, I must defer my judgment here as to the availability of declaratory relief until such time as further evidence is submitted on this issue.

## CONCLUSION

In accordance with this Opinion, Defendants' Motion should be DENIED in part, and DEFERRED in part.

IT IS SO ORDERED.